[Crim. Nos. 9902, 9903.   Second Dist., Div. Four.   Mar. 23, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES ARLEN REID, Defendant and Appellant.

(Consolidated Appeals.)

John Alan Montag for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—These two cases, separately numbered as 2d Crim. 9903 and 2d Crim. 9902, were tried separately, the former being tried first. The two cases are closely related as to time and both defendant Reid and the People have filed single briefs covering both matters. This court will dispose of both appeals in this opinion.

### 2d Crim. 9903

Defendant Reid and defendant McHarbin were charged with grand theft, in violation of section 487 subdivision 3 of the Penal Code, committed on or about October 5, 1963, in that they stole a portion of a carcass of a bovine animal, the personal property of James Lloyd Ralphs, which animal had been killed without its owner's consent. The case was brought to trial in a department of the Superior Court of Los Angeles County, sitting in Los Angeles. A prior conviction of two felonies was also charged. Defendant Reid pleaded not guilty and denied the priors. Defendant Reid personally, and counsel, waived a jury trial. The court found defendant Reid guilty of attempted grand theft, (a lesser but necessarily

included offense). Defendant Reid's motion for new trial was denied. Upon conviction, the case was transferred to another department of the superior court sitting in Pomona, for the purpose of judgment, pending the outcome of the trial of defendant Reid in 2d Crim. 9902. After 2d Crim. 9902 was tried, probation was denied in 2d Crim. 9903, and defendant Reid was sentenced to imprisonment for the term prescribed by law, sentence to run concurrently with sentences in 2d Crim. 9902.

### 2d Crim. 9902

Defendant Reid was charged in Count I with murdering Marcelino Jesús Riera on or about October 6, 1963. In Count II, he was charged with burglary in that he entered the locked 1957 two-door Ford of Oris E. Payton on or about October 6, 1963, with the intent to commit theft. In Counts III through V, he was similarly charged as in Count II with respect to the 1957 two-door Buick of Sheldon M. Hayden, the 1955 two-door Dodge of Owen J. McCartney, and the automobile (not described in the testimony) of Herbert L. Ergeson. He was charged with the same conviction of two felonies as were alleged in 2d Crim. 9902. The case was brought to trial in a department of the Superior Court, County of Los Angeles, sitting in Pomona. Defendant Reid pleaded not guilty by reason of insanity as to Count I.

Thereafter, defendant Reid personally withdrew his plea of not guilty by reason of insanity. Defendant Reid personally, and all counsel, waived a jury trial as to the issue of the prior conviction. Defendant Reid personally withdrew his plea of not guilty to Counts II, III, IV and V, and pleaded guilty to burglary of the second degree. A jury was impaneled to try defendant Reid as to Count I.

On the day prior to the reading of instructions to the jury, proceedings were had in chambers, outside the presence of the jury, for the purpose of discussing the instructions to be given the jury. Defendant Reid's counsel and the district attorney agreed that the court should not give an instruction on second degree murder. No such instruction was given. The jury found defendant Reid guilty of murder in the first degree. The jury heard further evidence and fixed the penalty at life imprisonment.

Defendant Reid's motions for new trial on all statutory grounds and to reduce verdict to involuntary manslaughter were denied. Probation was denied. The court found the prior not true.

The court sentenced defendant Reid to imprisonment for life on Count I and for the term prescribed by law as to Counts II through V. Sentences as to Counts II through V were ordered to run concurrently with Count I; sentences as to Counts II and III were ordered to run consecutively to those imposed on Counts IV and V.

Defendant Reid appeals from the judgments in both 2d Crim. 9902 and 2d Crim 9903.

I

On October 5, 1963, James Lloyd Ralphs found a cow and a calf, both of which he owned, dead near Highway 38, about 3 miles south of Gorman. The cow had been hit in the head with some object and the calf had its hind quarters severed. The animals were beside the right-of-way fence of Ralphs' ranch.

On October 11, 1963, Deputy Sheriff Byron Bivee spoke to defendant Reid, who was in custody in the county hospital, charged with the offenses for which he was tried in 2d Crim. 9902. Reid then confessed to the commission of the crime and to the plan by which it was accomplished.

During the trial, Reid took the stand and testified that his statements at the hospital regarding the incident were substantially correct, except that, in his confession in the hospital, Reid stated that his codefendant McHarbin instigated the crime and killed the animals, whereas on the stand Reid admitted that he shot the animals and that McHarbin tried to stop him.

On the morning of October 6, 1963, eight to ten cars were parked in a parking area near the Falling Springs Lodge in San Gabriel Canyon. Between 10 a.m. and 11:10 a.m., six of these cars had been entered into. Damage and/or disarray was present in all of them. Articles had been removed from five of the cars, among which were: a floor mat, a seat cushion, a flashlight, an emergency lamp, and a pillow from the two-door Ford of Oris E. Payton; a thermos, a change purse with 50 cents, and sweat shirts from the 1957 two-door Buick of Sheldon M. Hayden; a sweater, some articles of women's rain clothes, a basket of rain clothes and a coin purse with a few cents in it from the 1955 two-door Dodge of Owen J. McCartney; a knapsack from the automobile of Herbert L. Ergeson; and a coffeemaker, a Relaxasizor in an orange container and a cushion from the automobile of Bert E. Watson. Defendant was charged with the burglary of all these cars except the latter one.

Between 11 a.m. and 11:45 a.m. on the same morning, defendant Reid was observed, proceeding northward up the canyon, in a blue and white 1957 Ford station wagon, by Hayden and Robert G. Grable, whose 1957 Plymouth station wagon had also been broken into. About five or ten minutes later, they observed defendant Reid proceeding southward back down the canyon.

At about this same time, McCartney, Payton and Watson saw the same station wagon journey up the canyon and then down again, but they did not specifically identify the driver as defendant Reid.

At 11.21, Robert Campbell, Deputy Sheriff of Los Angeles County, assigned to the San Dimas Sheriff's Substation, received a call asking him to contact the San Dimas Station. Acting upon this information he started up into San Gabriel Canyon about 11:39 a.m. in a sheriff's marked vehicle. Officer Campbell was in uniform. He was told to proceed to Falling Springs Lodge, the location for contacting the victims. He was looking for a blue and white Ford station wagon with one occupant, license number FHZ 032. En route, he stopped at the Rincon Ranger Station and had a brief conversation with the ranger who gave him some information. At this time Officer Campbell saw the described vehicle coming down the road, heading south, at about 30 to 35 miles per hour. It had one occupant, defendant Reid.

Officer Campbell drove onto the highway behind defendant Reid's station wagon and stopped it by turning on his red light and honking his horn. Defendant Reid stopped about one-tenth of a mile further down the road.

On approaching defendant's car, Officer Campbell stood by the front door. He noted the interior. He saw some articles on the floor in the back and a rifle on the back seat. He asked defendant Reid to step out and Reid complied. Officer Campbell explained to defendant Reid that some cars had been broken into higher up in the canyon and that defendant Reid's vehicle had been seen in the area. Defendant Reid said that everything in the car was his. Thereafter, a ranger drove up in a U. S. Forestry vehicle.

The ranger stated that he had followed defendant Reid's vehicle down from Falling Springs Lodge. The ranger walked around and looked into defendant Reid's vehicle. The ranger also said that another vehicle had been at the site where the cars were broken into. Officer Campbell asked the ranger to contact the unit at Falling Springs Lodge

to find out how the vehicles had been broken into and inquire as to the type of articles stolen. The ranger went to his vehicle which contained radio equipment. At this point, defendant Reid told Officer Campbell that he had found the articles in his car along the side of the road.

The ranger returned and stated, in the presence of defendant Reid and Officer Campbell, that a 20-cup Corey coffeemaker, a Relaxasizor in an orange case, a cool cushion, a pillow and a knapsack were missing; he also stated that the windows of the cars had been broken.

Officer Campbell, from the outside of defendant Reid's vehicle, observed on the floor of the vehicle a Corey coffeemaker, several cushions, a cool cushion, and something of an orange nature. Officer Campbell checked defendant Reid's rifle, which lay on the back seat. Officer Campbell then explained to defendant Reid that the articles had been stolen from the cars and that the windows were smashed, that this constituted burglary and that he would have to place defendant Reid under arrest.

Defendant Reid was arrested, handcuffed and placed in the front seat of the sheriff's vehicle. Officer Campbell further determined that defendant Reid's rifle was loaded; that it was a 30.06; and that it had numerous scratch marks on it. While in the sheriff's vehicle, defendant Reid asked for his cigarette lighter from the station wagon. Officer Campbell observed it on the floor of the station wagon along with a watch. Officer Campbell noticed that defendant Reid was wearing a watch. He asked defendant Reid if he found the watch on the road where defendant Reid claimed he found the other property. Defendant Reid said yes. Officer Campbell also noticed what appeared to be battery jumper cables in the back of defendant Reid's automobile. Defendant Reid said that he likewise found these on the roadway.

As they drove northbound up the canyon toward Falling Springs Lodge, defendant Reid pointed to a place on the left where he said he found the aforementioned items after previously stating that everything in his car was his own. On the way down from Falling Springs Lodge, however, defendant Reid said he found the watch at a different location.

They arrived at Falling Springs Lodge between 12 m. to 12:30 p.m.

Officer Campbell examined the watch which was found in defendant Reid's station wagon and observed that the front crystal was fogged with moisture of some type underneath

it; on this occasion he asked the victims of the car burglaries if it belonged to them and none could identify it. However, Officer Campbell had many items in his car which he asked them to identify. Payton identified a floor mat at that time and later, at the Rincon Ranger Station, picked up the flashlight, emergency lamp and pillow after he discovered they were missing. Hayden identified a thermos. A sweater and a raincoat were returned to McCartney. The Relaxasizor, coffee pot, sunglasses and seat cushion were identified and returned to Watson.

While at Falling Springs Lodge, Officer Campbell apparently received a call over his car radio and, acting on the information, placed a call to the dispatcher over his car radio, and in the presence of defendant Reid, requested an additional unit to go to Bichota Canyon. A body had been found there lying face down in a stream.

On October 6, 1963, at about 12:30 p.m., some picnickers, John R. Croncite and Jerry Shesko, observed a Dodge automobile about 20 feet upstream. They proceeded to walk toward it and a few minutes later they discovered a body lying face down in the stream among some bushes. There was no one else present within a quarter of a mile of where the body was found, except for their wives and a passerby whom Croncite asked to send a ranger.

Officer Dalke, Deputy Sheriff of Los Angeles County, was assigned to the San Dimas Substation on October 6, 1963. He was advised by telephone that there had been a hunting accident in Bichota Canyon. The call came around 1:21 p.m. Officer Dalke arrived around 2.02 p.m. Croncite, Shesko and two forest rangers were present. A wallet, with the contents strewn about, was lying about 15 feet south of the body near the edge of the stream. There were some identification papers in the area. There were some keys underneath the body.

Officer Human, another Deputy Sheriff of Los Angeles County, was summoned to the canyon, arriving at about 2:35 p.m. on October 6. There he observed the body of the deceased, one Marcelino Jesús Riera, lying face down in the stream about 18 inches from the edge. Riera had black hair and a medium haircut. He was not wearing a watch. He had what appeared to be a very serious wound in the back of the head, and there were blood stains on the shirt he was wearing. The glove compartment of the Dodge was open. Several papers were on the floor and some were on

the seat. The right door was closed and the left door was unlocked but closed.

When the coroner arrived, Riera's body was rolled over and a search made of the pockets of his clothing. In the left front pocket was one penny. An autopsy was performed upon the body of Riera on October 7. It disclosed that death resulted instantaneously from a gunshot wound to the head. The bullet entered approximately in the area of the right ear and came out just above the base of the skull on the left side.

Meanwhile, at the Rincon Ranger Station, Officer Campbell asked defendant Reid how much money he had in his possession. Defendant Reid said he had between $30 and $35. Officer Campbell found at least two $20 bills and a $10 bill, together with other bills in defendant Reid's pocket. A later check at the San Dimas Sheriff's Substation disclosed that defendant Reid had about $63 in cash. Some $3.00 of this was in change.

About 2:37 a.m. on October 7, Officer Bublitz, who had participated in the investigation of the crime in Bichota Canyon, Lieutenant Walsh and Officer Human interrogated defendant Reid at the San Dimas Sheriff's Substation where defendant Reid had previously been taken. In this first session of the interrogation, defendant Reid related that, on October 6, he had fished at Redondo Pier until 3 a.m., that he then left the pier, obtained his 30.06 rifle and some ammunition, and entered his 1957 station wagon, license FHZ 032. He left shortly after dawn and arrived in San Gabriel Canyon between 9 a.m. and 10 a. m.; that after he arrived at the second ranger station he got out of his car, loaded his gun with ammunition and began hunting, firing three or four shots at squirrels, trees and chipmunks; that after hunting about an hour in this area, he drove to another area further north where he hunted for about 45 minutes, firing about three rounds of ammunition at trees, chipmunks and squirrels; that he then drove south about 3 miles beyond the place where he had first hunted; at this last location he found a number of items on the right side of the road, including a coffee pot, coffeemaker, orange suitcase containing some sort of instrument, floor mat, screwdriver and sunglasses; he put these items in the back of his car and drove south about 2 miles where he got out of his car, took his gun and walked down to the stream, fired two shots, returned to the road and observed a white Chrysler car product; he

entered this car for the purpose of burglary, went through the glove compartment, but took nothing; he entered his own car, drove south about one-half a mile where he saw a watch lying in the roadway; that he picked up the watch and placed it on the front seat of his car; he then turned around and headed north; he changed direction once again and drove south until he was arrested by Officer Campbell. Defendant Reid stated that he had about $70 on his person when he entered the canyon and that it was what remained of his pay check. This first session took about an hour and a half.

At 6:29 a.m., on October 7, the second session took place. The interrogation was taken down by a stenotype reporter. Defendant Reid's statements were for the most part repetitions of those of the first session. He maintained that bloodstains found in his station wagon, and on his jacket and pants were beef blood and he denied having seen the body of a man lying in the stream or having taken money or a wristwatch from the body of a dead man. At the end of the second session, defendant Reid stated that as soon as he spoke to his lawyers he might change his whole statement.

At about 7 p.m., October 7, Officers Bublitz and Stoyanoff took defendant Reid to the General Hospital for treatment of a bruise he had received on the top of his head. En route to the hospital, defendant Reid was asked if he wanted to change his earlier statement. He said he would not change his statement until such time as he could be contacted by an attorney and he felt that even after he talked to an attorney he would not change the statement. About 45 minutes later, in the General Hospital, defendant Reid stated, in the presence of the two officers, and after the treatment of the head bruise that, if he was allowed to talk with his mother on the telephone, he would give a full and true statement as to what happened in the canyon on October 6.

Officer Bublitz placed the telephone call to defendant Reid's mother, advising the lady who answered that defendant Reid wished to speak to her. Defendant Reid was permitted to talk to her on the telephone. While talking on the telephone, defendant Reid said that he had been hunting in the canyon, had shot two or three times, had fired at something which was moving in the brush, had gone over and found a man lying in the stream, had removed a watch, money and wallet from the body, and had gone through an automobile, and had broken into several other automobiles in the San Gabriel mountains that day.

After the telephone call was over, defendant Reid indicated that he was ready to make a full and complete statement with respect to the conversation he had just had with his mother. The interrogation commenced at 8:50 p.m. and concluded at 9:30 p.m. Present were the two officers and a shorthand reporter. In the course of the interrogation, defendant Reid acknowledged the car burglaries; that he shot indiscriminately at trees, squirrels, chipmunks and at something moving; that he could see about 3 inches of it and that it had hair. He acknowledged further that, after firing the shot, he went to the location of the object and he found a man lying face down in the stream with a hole in his head; that he took the man's wristwatch, the money ($35) and wallet from the pockets; that he went to a car parked nearby which he assumed belonged to the man and went through it to see what he could find; that he intended to burglarize it; that he had observed this white car where he parked his car but that he did not see anyone in it and figured the person was deer hunting.

On October 8, 1963, after defendant Reid's arraignment, he was taken by Officers Bublitz, Human, and a transportation officer from the sheriff's office to the scene where the body had been found. They left about 3:05 p.m. and arrived about 4 p.m. Pictures were taken at that time of defendant Reid. Defendant Reid showed them the location where he parked. It was about 300 yards north of where the deceased had parked. Defendant Reid indicated a location where he said he thought he could have fired at a moving object. It was about 75 feet from where the body was found. He indicated possibly six locations from where he could have fired a shot.

The wife of the deceased identified the Dodge automobile in question as her husband's, as well as the watch which had been found in defendant Reid's station wagon, and the battery cables also found there.

## II

Defendant Reid contends that the failure of the arresting officer to inform him of his right to counsel under the Sixth Amendment and the right not to incriminate himself under the Fifth Amendment, rendered all of his statements, admissions or confessions inadmissible as evidence. The record is clear that at no stage of the arrest and investigation, or at any other time, did the officers inform defendant Reid of his right to counsel or that any statement he might make would be used against him at the trial. Defendant Reid there-

fore relies on the rules laid down in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L. Ed.2d 977].

In *Escobedo*, the defendant had demanded the right to consult with counsel before being interrogated. Whether or not such a request was made here is open to question. On one occasion defendant Reid stated that as soon as he spoke to his lawyer he might change his whole statement and on another occasion he stated that he would not change his statement until such time as he could be contacted by an attorney and he felt that even after he talked to an attorney he would not change his mind.

However, it seems clear that the statements did violate the rules set forth in *Dorado*. In that case, the court rejected the contention that a request for counsel was a necessary prerequisite to a claim of denial of constitutional right. The court stated (at p. 349): "The right to counsel matures at this critical accusatory stage; the right does not originate in the accused's assertion of it. The accused's request for counsel indicates no more than that he, himself, at that point in the proceedings, perceived the need of legal assistance. The request merely constitutes evidence that the accused finds himself in an accusatory predicament."

In the *Dorado* decision, the court laid down four criteria which must be fulfilled before any finding shall be made that a defendant has been denied the right to counsel and the right not to incriminate himself: ". . . (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (*People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354.)

## III

In 2d Crim. No. 9903, defendant Reid was interrogated on October 11, 1962, in the County Hospital by Officer Bivee, Deputy Sheriff, County of Los Angeles. He admitted to the officer that he had gone with his codefendant McHarbin to the Gorman area; that he had a 30.06 rifle with him; that defendant McHarbin got out of the car, took the rifle, loaded

it and crawled under a fence where there were some cattle grazing; that he heard shots; that he saw a dead cow; that he then saw defendant McHarbin shoot a steer; and that both of them then cut off the hind quarters of the steer, put it in back of the car and proceeded to defendant Reid's house where they divided the meat. During this testimony the record does not indicate that defendant Reid was advised of his constitutional right to counsel or to remain silent.

Later that day, Officer Bivee interrogated McHarbin in the Hall of Justice and he told the same story defendant Reid told, except that he stated defendant Reid got out of the car, took his rifle and shot the cow. The record does not indicate that defendant McHarbin was advised of his constitutional right to counsel or to remain silent.

On the stand, defendant Reid admitted that he shot the calf and the cow, carried the carcass of the cow away, and that McHarbin tried to stop him. Defendant Reid gave as his reason for changing his story on the stand without apparent warning even to his counsel that, ''Well, I just wanted the truth brought out, your Honor.''

It is true that the use in evidence of the statement made by defendant Reid in the county hospital violated the rule of the *Dorado* decision. However, the use of this evidence is grounds for reversal only if it served as the basis for conviction. (*In re Seiterle* (1964) 61 Cal.2d 651, 657 [39 Cal.Rptr. 716, 394 P.2d 556].) In the instant case, defendant Reid confessed to the crime on the stand. Indeed, his testimony on the stand implicated him in the crime far more than the statement he made at county hospital and served as a much stronger basis for conviction. It cannot be argued that defendant Reid's confession to Officer Bivee or even the statement of his codefendant McHarbin to Officer Bivee motivated defendant Reid to confess on the stand. Defendant Reid indicated that his desire to tell the truth was the motivation for his confession on the stand. Furthermore, after defendant Reid had made his extrajudicial confession to Officer Bivee at the County Hospital, defendant Reid entered a plea of ''Not Guilty.'' As in the case of *In re Seiterle,* the plea of the defendant closest in time to the unlawfully obtained confession was one of ''Not guilty.'' The unlawfully obtained confession was not the motivation for the confession on the stand.

It is true that the case of *In re Seiterle* involves a change from a plea of ''Not Guilty'' to one of ''Guilty,'' whereas in the instant case, the plea of ''Not Guilty'' was never changed.

However, considering the facts of this case, this difference should have no bearing on the court's decision. The essential factor is that the finding of guilt in case No. 9903 was based on a valid confession, made in open court, at a time when defendant had the full assistance of counsel. Whether such a confession be express, as here, or implicit in a plea of guilty as in *Seiterle*, the determinative factor is the fact that the prior illegal confession did not serve as a basis for the judgment of conviction.

Under the circumstances here present, and on the authority of the *Seiterle* case, we hold that the admission in the trial of 2d Crim. No. 9903 was not such error as requires reversal. Since no other error with respect to that case is urged on us, we affirm the judgment in that case.

## IV

We turn, then to the consideration of case 2d Crim. No. 9902.

■ Since defendant pled guilty to the four counts of burglary, what we have just said with reference to the use of his confession in No. 9903 is pertinent as to the judgment on those counts. In withdrawing his earlier plea of not guilty and substituting the plea of guilty, the following took place:

"MR. JOHNSON [Deputy District Attorney] : Mr. Reid, have you plead [*sic*] guilty to the charges set forth in these counts because you believe in truth and fact you are guilty of those offenses?

"THE DEFENDANT: Yes, sir.

"MR. JOHNSON: You sat through a preliminary hearing, and you were arraigned on the charges before the preliminary hearing. You have been arraigned on the charges set forth in Counts II, III, IV and V. You do fully know the nature of the charges set forth in those four counts?

"THE DEFENDANT: Yes, sir, I do.

". . . . . . . . . . .

"MR. JOHNSON: Before entering that plea of guilty to the charges: Count II, III, IV and V, you had discussed the matter with your attorney; is that correct, Mr. Reid?

"THE DEFENDANT: That's right.

". . . . . . . . . . .

"MR. JOHNSON: Is the sole reason that you have pled guilty to Counts II, III, IV, and V the reason that you feel you are certain of your guilt in those counts?

"THE DEFENDANT: Yes, sir."

Since the plea of guilty removes any possible prejudice

resulting from the police activities, and since such a plea fore-closes any other possible attack on the judgment, we affirm the judgment in 2d Crim. No. 9902 insofar as the four burglary counts are concerned.

## V

There remains the question of the effect of the investigatory and interrogatory activities above set out on the judgment on the murder count.

It is clear that the confession and admissions which defendant Reid made in his statement during the part of the interrogation which commenced at 8:50 p.m. and ended at 9:30 p.m. on October 7, meet all of the criteria above set out from the *Dorado* decision.

However, prior to the above-mentioned confession and admissions, defendant Reid had made a telephone call to his mother in the presence of two officers in which he stated to her substantially the same facts which he was later to relate to the officers in the confession and admissions. The telephone call was made at defendant's own request.

During the telephone conversation, defendant Reid stated that he had fired at something moving in the brush, had gone over and found a man lying in the stream, had removed a watch, money and wallet from the body, had gone through the automobile, and had broken into several other automobiles in the San Gabriel mountains that day.

In his subsequent statement containing the confession and admissions, defendant Reid added only the following few details of any consequence—that he shot indiscriminately at trees, squirrels, and chipmunks, that the moving object he shot at had 3 inches of hair and that the amount of money taken from the dead body was $35.

Testimony was given that defendant Reid, sometime during the evening of October 7, told Officer Bublitz that the scratch marks on the butt of his rifle resulted from his breaking the windows of the automobiles. Whether this admission occurred before or after the telephone conversation is not clear, although the record would seem to show that this admission was made during the interrogation which began at 8:50 p.m. and lasted until 9:30 p.m., since that is the only time that record indicates any information was given by defendant Reid on the evening in question. However, it is unnecessary to decide whether there is any significance to the fact that an admission may have been made prior to the telephone conversation. The court will consider that the statement was

made after the telephone conversation as the rule is well established that the facts will be viewed in the light most favorable to the People. (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].)

Since there were no eyewitnesses who testified at the trial and defendant Reid denied that he had knowledge or intent of shooting the victim, a conviction could only be obtained if the prosecutor moved the jury to disbelieve defendant Reid. The record is replete with instances during cross-examination in which the prosecutor used the statements of defendant Reid to impeach his testimony. During one part of the cross-examination defendant Reid was interrogated as follows:

"Q. Now, when you spoke to Detectives Human and Bublitz on October 7, 1963 at the San Dimas Station, . . . at the end of the conversation you said that you might change the whole statement the next time you made a statement, didn't you? A. Yes, sir.

"Q. Would that be true of your testimony here in court, that 15 minutes from now you might change it and say there were many vehicles going up and down the canyon? A. No, sir."

Indeed, defendant Reid had stated twice that he might change his statement as soon as he saw his lawyer. In the cross-examination, defendant Reid's words were taken out of context without the pertinent reference to seeing a lawyer.

On another occasion, the prosecutor questioned defendant as follows:

"Q. . . . When you spoke to them [the interrogating officers] did you know whether or not you had killed a man? A. No, sir.

"Q. Did you know whether or not the blood was clotted? A. Yes, sir.

"Q. You knew it was clotted? A. Yes, sir.

"Q. Why didn't you tell them? A. They didn't ask.

"Q. Why didn't you volunteer that it was clotted and hence you had not killed the man? A. I believe it was— you'll read the thing. They said they will get all the information. They ask questions, and I answered them.

"Q. They were getting the information from you, weren't they? A. Yes.

"Q. Was there anybody else they could get the information from insofar as what was seen through your eyes? A. No, sir.

"Q. Why didn't you tell them 'clotted'? A. I don't know, sir.

"Q. Well, the truth of the matter was the blood was gushing from the head of Mr. Riera when you approached; wasn't it? A. No, sir."

There were other instances in which the statements were used to impeach defendant Reid's credibility by pointing out inconsistencies between the statements themselves or between a particular statement and defendant Reid's testimony at trial. Among these were varying inconsistent remarks concerning the presence of a "Chrysler product" in the canyon where decedent's body was found and inconsistent statements regarding whether or not defendant Reid had parked his car near the Falling Springs Lodge where the burglaries took place.

██ The Attorney General argues that, since the information obtained by the officers as a result of monitoring the phone call was not obtained during any process of interrogation, an essential element of *Dorado* is missing.

We think that there are two answers to this argument. In the first place, the officers, after defendant had been arrested, and at a time when he obviously was suspected of the burglary offenses herein involved, took him on an extensive journey to visit the scenes of the crimes, and subjected him to a process of interrogation obviously designed to secure incriminating statements from him. These interrogations were followed by the extensive interrogations, directed to all of the offenses, in the early hours of October 7th. All of these statements were used against defendant, all of them clearly met the criteria of *Dorado,* and that use would compel a reversal even if the final statement did not.

In the second place, the "request" for a phone call was a part of a continued interrogation by the officers, beginning with his arrest, continuing throughout the visitations to the scenes of the crimes, throughout the early hours of October 7 and the early evening of that day, and while defendant was en route to the hospital. To say that defendant's request, made during the latter trip, and the phone call thereafter permitted to him, were totally disconnected from the whole long process of an interrogation which obviously was one "that lent itself to eliciting incriminating statements" is totally unrealistic.

It follows that the judgment of conviction in 2d Crim. No. 9902, resting as it does on statements illegally obtained, must be reversed.

## VI

Defendant urges other alleged errors which he claims require a reversal of the murder conviction, as follows:

(1)  That his arrest without a warrant, and the subsequent search and seizure of his automobile, were unlawful and that the exclusionary rule should have been applied to prohibit the introduction of evidence thereby obtained;

(2)  That his statements, hereinabove discussed, were not free and voluntary;

(3)  That the police officers prohibited him from making the two telephone calls, as provided for in section 851.5 of the Penal Code;

(4)  That error occurred in the admission of evidence of other crimes and from conduct of the district attorney in asking certain questions on cross-examination;

(5)  That the trial court erred in permitting him to withdraw his plea of "Not Guilty by Reason of Insanity"; and

(6)  That the trial court erred in not instructing the jury, on its own motion, on second degree murder, even though the giving of such an instruction had been expressly waived.

We need not discuss the second of these points, since we have held, as above indicated, that the statements, even if free and voluntary, were inadmissible under the *Dorado* rule.

Nor need we consider the interesting problem posed by the sixth point since, in the event of a retrial of the murder count, it is not likely to arise. If under the evidence then presented, counsel believes an instruction on murder second is proper, presumably he will request it.

We proceed to consider the other four points, which may be of importance in the event of a retrial, using the identification numbers from the above list.

■ (1) The search and seizure point is without merit. Having received an official report to the effect that automobiles had been broken into, and having then observed the described vehicle in the general area of the burglaries containing a lone occupant, it was not unreasonable for Officer Campbell to stop defendant Reid for investigation short of arrest. ■ California's rule permitting temporary detention for questioning is consistent with the Fourth Amendment guarantee against unreasonable searches and seizures. (*People v. Mickelson* (1963) 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658].)

■ Officer Campbell noticed, while outside defendant Reid's automobile, that it contained various articles. A ranger arrived and said he had followed defendant Reid's vehicle down from Falling Springs Lodge. Officer Campbell had the ranger make a radio call for the description of the stolen articles. The ranger reported to Officer Campbell certain items which had been stolen, and their general description tallied with items in defendant Reid's vehicle. What Officer Campbell observed in plain sight did not constitute a search. (*People* v. *Lopez* (1963) 60 Cal.2d 223, 241 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Beverly* (1962) 200 Cal.App.2d 119, 125 [19 Cal.Rptr. 67].)

■ (3) The claimed violation of section 851.5 of the Penal Code is of no avail to defendant at this stage. It is true that the record shows no excuse for a delay far beyond the three-hour limit prescribed by that section. However, it is also devoid of any indication that defendant had requested the right to make any phone call at an earlier time, or that the request, when made, was not promptly complied with.

It was held in *In re Newbern* (1961) 55 Cal.2d 500, 507 [11 Cal.Rptr. 547, 360 P.2d 43], that a violation of this section is not a basis for an attack on judicial proceedings unless the violation "resulted in the denial of a fair trial or prevented the petitioner from obtaining and presenting evidence of his innocence. . . ." We have discussed, above, the effect of the phone call, and of its timing, on the admissibility of the statements obtained from defendant and have given full relief from those effects. We can find, in this case, no indication of any other effect on defendant's rights which amounted to a violation of due process of law.

(4) Defendant contends that the court erred in allowing evidence of the four burglary counts charged in the information to be presented to the jury after defendant Reid had already entered pleas of guilty to those counts. ■ However, the rule is clear that:

"It is the law that evidence which tends logically and by reasonable inference to establish any fact material to the People's case . . . is competent although it may connect the defendant with a crime not included in the accusation. [Citing cases.] ■ Such evidence is admissible when it tends to establish intent, guilty knowledge, motive, a common scheme, plan or system" (*People* v. *Sizelove* (1955) 134 Cal. App.2d 104, 107 [285 P.2d 4].) Indeed, the prosecuting

attorney expressed the opinion that the evidence showed motive and intent of the murder.

Defendant Reid complains of his cross-examination relative to his conviction of a prior felony, to his shooting a second cow, a charge for which defendant Reid was not convicted, to his possession of $15 which he said he stole from Paul McHarbin, and to the burglaries. However, no objection to these matters was made during the trial. Defendant Reid may not complain in the absence of objection. (*People* v. *Millum* (1954) 42 Cal.2d 524, 528 [267 P.2d 1039].)

Furthermore, evidence concerning conviction of a prior felony is within the purview of impeachment. (Code Civ. Proc., § 2051; *People* v. *Miller* (1961) 196 Cal.App.2d 171, 176 [16 Cal.Rptr. 408].)

Defendant Reid complains of a question on cross-examination in which there was a reference to where he shot at the body. Defendant Reid objected to the reference as assuming a fact not placed in evidence. Since defendant Reid acknowledged on direct examination that he shot at an object and then found the body and since the question was withdrawn on objection, no untoward effect is demonstrated.

Defendant Reid complains about the following question on cross-examination:

"Q. Were you planning on shooting whoever [*sic*] came upon you stripping the body? A. No, sir."

The only objection interposed to the question was that: "They [the questions on cross-examination] are coming too fast. He should have a chance to answer."

If any undue effect was apprehended from the questioning, an objection should have been interposed on that ground and not merely on the grounds of insufficient time to answer.

(5) As a basis for the claim of error in connection with the withdrawal of the insanity plea, defendant relies on *People* v. *Merkouris* (1956) 46 Cal.2d 540 [297 P.2d 999]. In that case, there was evidence before the court which, while disputed, plainly suggested the existence of the "present" insanity envisaged by section 1367 of the Penal Code, and the withdrawal of the insanity plea was permitted although the defendant's trial counsel did not consent to the change of plea. The Supreme Court pointed out (at p. 553 of 46 Cal. 2d) that the trial judge had actually expressed the statutory doubt as to present sanity. It was under those circumstances that the Supreme Court found error in permitting a defendant, whose present competency stood undetermined, to exer-

cise such an important decision without the consent of his trial counsel.

In the case at bench, no suggestion of present insanity was made by defendant, by his trial counsel, or by the judge. While the trial judge did appoint psychiatrists to examine defendant, he stated expressly that he did so only to be sure that no doubt should arise in his mind and that the reports (all of which concluded that defendant was sane) had not created the statutory doubt. The situation here, thus, is comparable to that which was discussed in the second opinion in Merkouris' cases, written after his second trial. (*People* v. *Merkouris* (1959) 52 Cal.2d 672 [344 P.2d 1].) None of the problems existent in *People* v. *Westbrook* (1964) 62 Cal.2d 197 [41 Cal.Rptr. 809, 397 P.2d 545] are here present. The question is simply whether a defendant, competent to stand trial, should be compelled, over his objection and that of his counsel, to litigate an issue which neither he nor his counsel desire to litigate, and which the trial judge, on ample evidence, concludes is without merit. To state the question is to answer it.

The judgment of conviction in case 2d Crim. No. 9903 is affirmed.

In case 2d Crim. No. 9902, the judgment of conviction on Counts II, III, IV and V is affirmed; the judgment of conviction on Count I is reversed.

Files, P. J., and Jefferson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 19, 1965. Peters, J., was of the opinion that the petition should be granted.