[Crim. No. 6938. Second Dist., Div. One. Mar. 30, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD THOMAS BENAVIDEZ, Defendant and Appellant.

Edward Thomas Benavidez in pro. per., and Robert W. Stanley, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—The judgment of the trial court in this cause made on June 19, 1959, (adjudging defendant guilty of first degree murder) was affirmed by this court in an opinion filed on June 8, 1960, (*People* v. *Barreras, et al., Benavidez, Appellant,* 181 Cal.App.2d 609 [5 Cal.Rptr. 454]); appellant's petition for a hearing by the Supreme Court was denied August 3, 1960. Thereafter, pursuant to decision of the Supreme Court of the United States, the remittitur herein

was recalled and the judgment of this court was vacated in order to consider (in the light of *Douglas* v. *California,* 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811]) the matter of appointment of counsel for defendant Benavidez who had appeared in propria persona when this appeal was previously before this court. Thereupon, this court appointed Mr. Robert W. Stanley as counsel for Benavidez. Again the judgment of the trial court was affirmed by this court in an opinion filed December 1, 1964; appellant's petition for a hearing by the Supreme Court was granted on January 27, 1965, and the cause retransferred to this court for reconsideration in light of *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

Defendant and one Barreras were charged with robbery, attempted robbery and murder. The cause was submitted on the transcript of the testimony taken at the preliminary hearing; also submitted by way of stipulation for consideration by the court, was a written statement of the defendants and one Trujillo taken upon their arrest by the officers. Defendants offered no evidence on their behalf nor did they testify at the trial. Both were found guilty of first degree murder; the first two counts were dismissed. Only Benavidez appealed.

At approximately 2:05 a.m. on December 21, 1958, Allsop and Johnson walked across the street behind a 1949 Mercury automobile; as they continued walking the car pulled up alongside of them from which emerged Barreras and defendant. Trujillo, a minor, remained in the car. They told Allsop and Johnson, at whom defendant was pointing a gun, to throw down their wallets. Allsop, having no wallet, threw his change on the ground; Johnson, having an injured back, sat down on the ground to rest. He then got up, and "holding his back, walked toward them"; defendant shot him in the chest. Johnson died December 25, 1958, the result of the gunshot wound. Defendant and Barreras then returned to the car, which had stalled, and forced Allsop at gun point to help push it; Allsop did so, but immediately thereafter called police who found Johnson's body face down near a Mercury automobile stuck in the mud.

Several hours later, around 4:30 a.m., defendant and Barreras appeared at the home of Angie Villalobes on 118th Place. Defendant told her he was in trouble and asked her to take his friends home; he told her he had shot a man. Around 6 or 6:30 a.m. he placed the shotgun under her bed. Later officers rang the bell and walked into the front room of a house on 46th Street where they arrested Barreras who was asleep on a couch. He asked them why they were arresting him and

when they told him that he knew, Barreras responded, "No"; one officer picked up a pair of shoes from the floor and asked him to look at the mud on them; the police told him they had found the automobile and knew he had shot a man. Barreras then said he had been there and shot him, and he would take them to the others, directing them to 118th Place, where police took defendant into custody. Defendant was asleep when they arrived; when he asked what it was all about, he was told, "Don't you know?" Police advised him they knew what had happened and knew a man had been shot, and said they wanted the shotgun; when told that they would search for it, defendant said, "Well, you will find it anyhow, it is there under the bed," pointing to the foot of the bed in which he had slept. The shotgun was disassembled under the mattress. The officers took defendant, Barreras and the juvenile, Trujillo, to the police station where their statements were taken.

Defendant's statements were freely and voluntarily given without promise of reward. Defendant said that he, Barreras and Trujillo had met around 6:30 p.m. and had driven around; that shortly after 2 a.m. they were around 182nd and Western; that Barreras was driving, Trujillo was seated in the front and he was in the rear with the shotgun; that two men came out of a bar, they were both drunk and one thumped the car; that they got out and went to where the men were standing; that he had a shotgun in his hand and asked the man why he had hit the car; that upon their denial and after one called them names, Barreras said, "Throw your money down," and he (Benavidez) told them to put up their hands; that one threw money down, the other laid down on the grass, then got up and started towards him, and he (Benavidez) shot him; that he didn't know whether the gun went off accidentally or deliberately but he tried to shoot him in the leg; that after shooting Johnson he held the gun on Allsop and made him push the car, but after it started it stuck in the mud; and that they abandoned the car and went to Angie's house. Neither defendant testified at the trial or offered a defense.

The evidence read without the confession leads to the inescapable conclusion that Benavidez killed Johnson in cold blood in the perpetration of a robbery; it shows no mitigating circumstances of any kind.. Benavidez held the shotgun on the two victims, shot Johnson, forced Allsop at gun point to help push the car out of the mud while Johnson lay dying, abandoned the car when it could not be moved, fled the scene

on foot, secreted himself in the home of a friend and hid the gun under the mattress of the bed on which he was found sleeping by the officers. Neither defendant saw fit to take the stand and explain what occurred.

 Appellant's contentions relative to the sufficiency of the evidence to support the conviction of first degree murder, the variance between pleading and proof, the use of an information in a capital case, denial of his constitutional rights during trial, the admissibility of certain evidence and his claim of double jeopardy are all without merit, but, while the record shows that his confession was freely and voluntarily given, we are compelled to conclude under recent rulings in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], that it was not properly admitted in evidence compelling a reversal of the judgment.

Inasmuch as defendant's written confession that he shot Johnson in the perpetration of a robbery was given by him at the police station after his arrest (upon evidence which provided reasonable grounds for focusing upon defendant as the particular suspect), it must be conceded that the investigation had then ceased to be a general inquiry into an "unsolved crime" and had begun to focus on Benavidez, and that the process of interrogation had shifted from general questioning to the accusatory stage, the purpose of which was to obtain incriminating statements and "to elicit a confession." (*Escobedo* v. *Illinois* (1964) 378 U.S. 478, 492 [84 S.Ct. 1758, 12 L.Ed.2d 977].) There is absent in the record any showing that at the time Benavidez was interrogated at the police station, he was represented by counsel or knew of his right to have a lawyer, or that he had in any manner been warned by the officers of his "absolute constitutional right to remain silent" (378 U.S. 478, 491) or knew of that right.

*Escobedo* holds that an accused must be afforded his right to counsel as soon as "the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession. . . ." (378 U.S. 478. 492), and that he has the right not to incriminate himself, and must be informed of his "absolute right to remain silent." (378 U.S. 478, 485.) The facts in the case at bar bring it squarely within the rule of *Escobedo,* with the exception that defendant did not request counsel; however, on this issue the case of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], controls.

Rejecting the contention that the failure to request counsel

constitutes a waiver thereof, the Supreme Court in *People* v. *Dorado* (1965) 62 Cal.2d 338, 349 [42 Cal.Rptr. 169, 398 P.2d 361] declared: "The right to counsel matures at this critical accusatory stage; the right does not originate in the accused's assertion of it." It held that he must know of his right in order to intelligently waive it and that "In the absence of evidence that defendant already knew that he had a right of counsel during interrogation, the failure of the officers to inform him of that right precludes a finding that he knowingly waived it."* As to the right of one accused to remain silent, the Supreme Court in *Dorado* had this to say: "*Escobedo* also holds that the accused has the right not to incriminate himself and to remain silent, and that, in any self-incriminatory statements are to be admissible, he must waive that right. Such waiver presupposes knowledge of the right to remain silent; in the absence of evidence of such knowledge, the waiver requires a warning to the accused of that right."*

Without any doubt the evidence, excluding appellant's confession, points directly to his coldblooded killing of Johnson with a sawed-off shotgun while he and Barreras were in the process of robbing Johnson and Allsop. But regardless of how strong the evidence of guilt against appellant may be, the rule of *Dorado* does not permit the disposition of the introduction of his confession on the ground that it constitutes harmless error, for therein the court held that the use of the confession results in a denial of due process and requires reversal regardless of other evidence of guilt. Therefore, we are precluded from inquiring into whether appellant was prejudiced by the admission in evidence of his confession in the light of the clear and undisputed testimony of Allsop, an eyewitness, Angie Villalobes, to whom, immediately after the killing, he told "he had shot a man," and the officers, the results of the police investigation, and the statements made to the police by him before he was taken into custody. Thus, inasmuch as the matter of prejudice is not subject to our inquiry, we are compelled to reverse the conviction. (*People* v. *Dorado,* 62 Cal.2d 338, 357 [42 Cal.Rptr. 169, 398 P.2d 361].)

The judgment is reversed.

Wood, P. J., concurred.

FOURT, J.—I dissent.

This case is but another result of the engulfing mania of some courts to find, or to attempt to find, a so-called newly-

---

*People* v. *Dorado,* 62 Cal.2d 338, 352 [42 Cal.Rptr. 169, 398 P.2d 361].

born protective constitutional right for the benefit of a properly convicted dangerous criminal with the result that the criminal can be released.

The chronology of the significant events involved in this case is as follows:

December 21, 1958—Murder and robberies committed.

January 22, 1959—Information filed charging appellant and codefendant with (1) robbery, (2) attempted robbery and (3) murder.

January 23, 1959—Defendants arraigned.

February 6, 1959—Defendants each plead not guilty; appellant also pleads self-defense.

March 17, 1959—Trial continued to May 12, 1959.

May 12, 1959—Stipulated by all parties to submit the matter upon transcript of preliminary hearing—continued to May 19, 1959.

May 19, 1959—Both sides rest — each defendant found guilty as charged in count three — found to be murder in first degree.

June 19, 1959—Sentence imposed (life imprisonment).

June 28, 1959—A telegraphic notice of appeal received June 29, 1959. No showing as to who sent or signed the telegram.

> Letter of appellant dated July 29, 1959, directed to this court and received October 26, 1959, wherein appellant, in his own handwriting states that he is guilty of murder but wanted an attorney appointed for him.

December 23, 1959—This court considered the record — made an independent investigation — determined that would be neither advantageous to appellant nor helpful to the court to have counsel appointed — application for an attorney denied.

February 23, 1960—Appellant filed a 28-page brief.

April 5, 1960—Respondent filed answer.

April 21, 1960—Appellant filed a nine-page closing brief.

June 8, 1960—Opinion filed in District Court of Appeal — 181 Cal.App.2d 609 [5 Cal.Rptr. 454] (affirmed the judgment).

July 13, 1960—Appellant petitioned Supreme Court for hearing.

August 3, 1960—Order filed by Supreme Court unanimously denying appellant's petition for a hearing.

August 8, 1960—Remittitur issued and judgment became final (supposedly).

January 31, 1963—Judgment having become final — the sawed-off shotgun used in the killing and other exhibits destroyed by court order pursuant to law.

March 18, 1963—*Douglas* v. *California* — 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811] decided by the Supreme Court of the United States.

April 2, 1964—Petition by appellant's counsel to recall the remittitur.

April 7, 1964—This court, because it had to, recalled the remittitur and vacated the judgment pursuant to *Douglas*.

June 22, 1964—*Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], decided by the Supreme Court of the United States.

July 24, 1964—Appellant filed opening brief — (no mention made of *Escobedo*).

August 24, 1964—Respondent's brief filed.

December 1, 1964—Opinion of this court filed, again affirming the judgment.

January 5, 1965—Appellant's petition for hearing filed in the Supreme Court.

January 27, 1965—Supreme Court granted hearing and the cause was retransferred to this court for reconsideration in the light of *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

March 30, 1965—Opinion filed in this court reversing the judgment with dissent.

As indicated in the majority opinion, this cause was submitted to the trial court by a stipulation of the parties and counsel in open court. The appellant was present and he was represented by counsel at all times during the proceedings in the municipal and trial court.

Although the defendants were charged with other serious offenses (robbery and attempted robbery), the prosecutor elected to proceed upon the murder charge only. Counsel for both sides meticulously and accurately stipulated to what at that time was considered by everybody concerned to be a perfect first degree murder record. It was stipulated, among other things, that the testimony taken at the preliminary hearing would be submitted to the court, that such procedure would be agreeable to all concerned and that the People's case might be heard upon such testimony; further, that the exhibits as marked in the preliminary hearing would be re-

ceived in evidence (the sawed-off shotgun, photographs, coroner's report, shotgun shell pellets and the shirt worn by deceased) and, further, *that the People could submit as evidence the statements made by appellant and his codefendant at the police station and such statements to be considered as though a proper foundation was laid, and that the statements were freely and voluntarily made.* (Appellant's counsel again at this point and at that time in the case explained the procedure to appellant.) It was also stipulated that if either defendant wanted to explain anything concerning the statements he could do so.

The testimony set forth in the preliminary hearing transcript establishes, among other things, that appellant held a sawed-off shotgun in his hands during the robbery. Further, that at a distance of not less than 3 feet nor more than 4 feet from the deceased victim, appellant pointed the shotgun at the victim's chest and fired. There was a massive penetration of No. 6 size shotgun pellets into the entrails of the victim, a man of about 40 years of age who obviously died shortly afterwards. Appellant then told the surviving victim "if you run I will shoot you" and he (the surviving victim) was directed to assist in pushing the defendants' car to get it started to the end that defendants could make their escape.

The statement taken at the police station was transcribed. In that statement appellant said, among other things, that after the two men who were being robbed were told to "throw your money down" he, appellant, told the men to keep their hands where he could see them. With reference to the shotgun blast into the victim's chest, appellant stated "well, I don't know if the gun went off accidentally or deliberately, but I tried to shoot him in the leg." "So, I stayed, stayed right there, you know. So, the hammer of the shotgun was already pulled back, and I had my hand on the trigger, like that." "[D]idn't intend to shoot him in the stomach . . . intended to shoot him in the leg."

Appellant also had a blackjack with him.

The statement was initialed by each of the defendants. It was also indicated in the statement that appellant had met his codefendant in a juvenile tank in the city jail a few years before, then later at Norwalk and still later at Whittier.

At the time set for the further hearing in court, appellant was present with counsel, and appellant elected not to testify, and the matter was submitted to the judge upon the record

heretofore indicated for determination. The judge announced that it was "with great regret" that he was compelled to find the appellant and his codefendant guilty of first degree murder. The penalty phase of the case obviously had been previously discussed between the parties, counsel and the judge, for the prosecutor said: "The prosecution does not wish to offer any further evidence on the second phase, or issue of penalty, and I will state my position in keeping with my word, counsel. I have discussed this matter thoroughly with them before we tried this matter, and although this is a close case in my opinion as to whether it should be capital punishment, I have examined all the evidence, and insofar as the District Attorney's office is concerned, we are not urging the Court, or asking the Court to impose capital punishment. These defendants showed no remorse for the man they shot. They fled the scene with the assistance of the man, the victim who was not shot, and if the car hadn't broken down later, they would not be here today. But in any event, I am not asking the Court to impose capital punishment."

The judge then announced, ". . . gentlemen . . . the court has conferred with your attorneys and the District Attorney, and under the circumstances I agreed that I would not consider capital punishment. . . ." and then said that it was with "deep regret" that he was compelled to sentence them to the state prison and that he wanted to give them "every possible opportunity for the Adult Authority to think about parole later on." At the time of sentencing, the judge further stated, "I regret to inform you gentlemen . . . I have no other alternative . . . except to deny probation and sentence you to state prison . . . You may get out when you are still young . . . I hope you do. . . ."

I fully realize that this court, as an intermediate appellate court, is generally called upon to serve in effect as a judicial moon, reflecting as best we can, the light from the sun of our system (in administering justice) the Supreme Court. The latest shaft of light from that source in the direction of a case such as this and upon which my colleagues rely is set forth in *People* v. *Dorado* and *Escobedo* v. *Illinois*.

The first opinion in this case by this court is reported in 181 Cal.App.2d 609 [5 Cal.Rptr. 454], filed June 8, 1960. The appellant petitioned the Supreme Court for a hearing. That court unanimously denied the petition, and the judgment supposedly became final on August 8, 1960. About two and one-half years later (March 18, 1963) *Douglas* v. *California,*

372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811] was decided by the Supreme Court of the United States and that court held in short that this court's denial of an appellant's request for appointment of counsel under the circumstances of *Douglas* was error. In the case at bar we denied the appointment of counsel for appellant because as we viewed the record, it did not warrant the appointment of counsel. In April 1964, one year after *Douglas,* a petition was filed in this court to recall the remittitur and vacate the judgment in this case. We were compelled to grant the motion under *Douglas* and we did so.

In *Douglas* it was said that "the type of an appeal a person is afforded in the District Court of Appeal hinges upon whether or not he can pay for the assistance of counsel"— further that "the indigent where the record is unclear or the errors are hidden, has only the right to a meaningless ritual, while the rich man has a meaningful appeal. . . ." Such a statement is wholly untrue if directed to the case at hand. This court thoroughly examined the record in every detail and wrote the opinion, and the opinion on its face belies any possibility that a rich man might have fared better in this proceeding. The Supreme Court of this state (not then widely known as a pro-prosecutor court), unanimously denied a hearing. In other words, three justices of the District Court of Appeal and seven justices of the Supreme Court each carefully scrutinized the record and determined that the judgment should be affirmed.

In any event, counsel was appointed by this court the second time around, briefs were submitted and the cause was again argued. The second opinion again affirming the judgment was filed December 1, 1964. There was thereafter a petition for a hearing in the Supreme Court and that court granted the hearing and "retransferred" the case from the Supreme Court to this court "for reconsideration in light of *Escobedo* v. *Illinois.*" I will approach the matter in that light.

The opening paragraph of *Escobedo* states:

"The critical question in this case is whether, under the circumstances, *the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution* as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S. 335, 342 [83 S.Ct. 792, 9 L.Ed.2d 799, 804, 93 A.L.R.2d 733], and thereby renders inadmissible in a state criminal trial any in-

criminating statement elicited by the police during the interrogation.''

Near the conclusion of the majority opinion in *Escobedo* it is further stated: ''We hold, therefore, *that where, as here,* the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, *the suspect has requested and been denied an opportunity to consult with his lawyer,* and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S. at 342, 9 L.Ed.2d at 804, 93 A.L.R.2d 733, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial.'' (Italics added.)

Words are the best tools we have to successfully communicate what we mean and what we think. When a majority of a court, even the Supreme Court of the United States, states something unequivocally and in plain words, certainly the words they use should be taken and interpreted in their commonly accepted sense and meaning. Otherwise, the results can be catastrophic, for whatever may be stated can be bent, twisted, or distorted to meet the fancies of those who use those words. In *Escobedo* the critical question was *''whether, under the circumstances, the refusal by the police to honor [Escobedo's] request to consult with his lawyer during the course of an interrogation. . . .''* should constitute a violation of his constitutional rights and thereby render inadmissible any incriminating statement elicited by the police. (Italics added.)

At or near the conclusion of the majority opinion, the court in *Escobedo* again set forth the conditions which must exist and under which the statements of the suspect could not be used, namely, (1) when the investigation is no longer a general inquiry into an unsolved crime, but has focused on a suspect, (2) the suspect is in custody, (3) the police carry out a process of questioning which lends itself to eliciting incriminating statements, (4) *the suspect has requested and been denied an opportunity to consult with his lawyer,* and (5) the police have not effectively warned him of his absolute constitutional right to remain silent.

In *Dorado* the court has in effect held that when the police have a suspect in custody, and the inquiry is focused on him and there is a process of interrogation which lends itself to incriminating statements and the police have not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he waived such rights, then the defendant's confession cannot be introduced into evidence. In other words, our court has moved the rules of formal court proceedings back to the police station. In effect, a policeman, under the rule set forth, when he thinks he has a prime suspect in custody must proceed to arraign the suspect for further questioning — and if the policeman does not so properly arraign the suspect, even a full, complete and voluntary confession of the suspect made within two minutes thereafter is not admissible at the trial. And this is done apparently (not to protect an innocent person) but to punish the police for a failure to perform their duty—but the net result is that a dangerous criminal is turned loose onto society and decent people are at the mercy of that dangerous criminal until he is caught in some other crime of violence.

A Pandora's box of confusion, uncertainty, disarray and discord is unleashed by such a decree. For example, the law books are full of cases where committing judges, trial judges and others have proceeded in cases with the understanding of all concerned that there was a sufficient, proper and legal waiver of some particular right by a defendant (such as a public trial, jury trial, delay in trial, delay in pronouncing judgment, appointment of counsel, jury challenge, etc.) and which later have been reversed by an appellate court because some justice thought that the judge of the lower court had misinterpreted the evidence of waiver. Can anyone imagine how many criminals in the future will swear (even though an officer has fully complied with the law of *Dorado*) to the effect that they did not really understand that they were waiving any rights, that they did not hear what the policemen had to say, that they were emotionally disturbed at the time and did not really mean to waive any rights. Furthermore, it can easily be seen in the light of the fact that no workable rule is or can be laid down as to what constitutes a proper waiver and as a consequence every police officer necessarily will be practically on his own. In other words, the court says, in effect, that it will nullify the policeman's efforts and the results obtained therefrom

if he does not meet the standards of the court, but the court refuses to tell the policeman in advance what the standards are. Could anyone design a better formula for handcuffing the police? Query: does the suspect have to make a declaration of waiver, or can he impliedly waive? What is the standard a policeman is to use in coming to a conclusion as to whether a suspect has intelligently and understandably waived his rights to keep still — keeping in mind, of course, that the waiver must depend upon the particular facts and circumstances of each case, including the background, experience and conduct of the suspect?

Heretofore the courts have thought that "the serious and weighty responsibility" of making a determination as to whether there was a waiver of a substantial right was lodged in the trial judge. (*Johnson* v. *Zerbst*, 304 U.S. 458, 465 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357].) Now, apparently, the policeman is supposed to make the determination as to whether and when the suspect makes an intelligent and knowledgeable waiver. The simple stating of the proposition makes it clear that the successful interrogation of suspects will be next to impossible under any such rule.

The Supreme Court of the United States has in the past ruled to the effect that there was no constitutional right with a suspect to be advised of his right to counsel or of his right to remain silent. (*Haynes* v. *Washington*, 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513]; *Crooker* v. *California*, 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448]; *Cicencia* v. *Lagay*, 357 U.S. 504 [78 S.Ct. 1297, 2 L.Ed.2d 1523].) Likewise, our Supreme Court has heretofore similarly held in *People* v. *Ditson*, 57 Cal.2d 415 [20 Cal.Rptr. 165, 369 P.2d 714]. *People* v. *Garner*, 57 Cal.2d 135 [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Kendrick*, 56 Cal.2d 71 [14 Cal.Rptr. 13, 363 P.2d 13] and *People* v. *Crooker*, 47 Cal.2d 348 [303 P.2d 753].)

Under *Dorado* policemen, who ordinarily are not required to be learned and skilled in constitutional law, now have the burden of advising suspects of their constitutional rights, and they must do so at just the right moment in the proceedings, otherwise the probabilities are extremely great that a self-confessed violent criminal will be turned loose. It appears that any court, at the very least, should look at the totality of the circumstances in the police procedure to determine whether there was fundamental fairness; even under those circumstances there would be no well-defined guide lines for a policeman to follow. There should never be a situation,

however, where a coldblooded, robbing murderer in the face of a mountain of conclusive evidence against him may be released into society solely because the police failed to comply with a rule which was nonexistent at the time of the investigation and the trial—and particularly so where the reversal is not upon the theory that possibly the defendant is innocent.

A hearing before a judicial officer in a judicial proceeding is one thing—a police investigation is something else. The rules of evidence should, of course, prevail in the judicial proceeding, but certainly not in the police interrogation process. The next step might well be to promulgate a rule to the effect that the police cannot consider hearsay evidence in their investigations. Query: what occurs in the event a suspect asks for a named attorney and the police secure that named attorney for the defendant and the suspect later claims that the attorney was ineffective, and, therefore, was no attorney at all—is the free and voluntary confession of the suspect made after he had talked to the named attorney to be admitted or rejected because counsel was supposedly ineffective? Is there to be a presumption that any suspect who confesses after seeing his attorney has an ineffective attorney?

Assume that a crime has been committed, and the police arrest a prime suspect and have him in custody and the suspect wants to talk to his attorney A (who has represented him in several other criminal trials) but A is out of the country on a vacation at the time and will not be back for 30 days—what do the police do—is the investigation at a standstill and stalemate—and if the suspect confesses in the meantime and before the attorney returns, is the confession admissible into evidence?

The police, as I understand it, are representatives of the executive arm of the government—there to enforce the law as written, to protect and to serve the community. Why should an officer be insulated from talking to a suspect? There seems to be expressed in both *Escobedo* and *Dorado* a veiled distrust of the police. As heretofore indicated, police are but the representatives of the public and the presumption is that they perform their duties faithfully and well, and the records bear out the fact that they do their jobs extremely well considering the judge-made hurdles which have been put into their paths. The fact that police work is not performed in public view should be of no particular consequence, for by the nature of things, it has to be so conducted—the work of the police is to ferret out crime and to keep the community a safe place

for its residents. It may be distasteful to have police at all or to have them investigating and questioning—on the other hand, it is more distasteful to be unable to walk on an ordinary street in a city without fear of violence being committed to your person or property. If people committed no crime, there would be little need for policemen. But be that as it may, the judicial attitude of this state seems entirely unrealistic as to conditions as they exist insofar as the police are concerned.

In *Dorado* the court waves aside any forebodings of law enforcement officials as to the effect of its ruling. The court cites as authority, in part, for its position a statement in an article by J. Edgar Hoover in a 1951-1952 Iowa Law Review (p. 182) where Hoover said:

"Agents are taught that any suspect or arrested person, at the outset of an interview, must be advised that he is not required to make a statement and that any statement given can be used against him in court. Moreover, the individual must be informed that, if he desires, he may obtain the services of an attorney of his own choice. Duress or brutality of any type is absolutely forbidden. Any Special Agent guilty of such conduct is subject to immediate dismissal from the service. The highest ethics of law enforcement become part of the Special Agent's credo. Nothing less can be accepted."

Hoover also pointed out in that article that the F.B.I. *is not a police force*—it is the *investigative* arm of the Department of Justice, *is strictly a factfinding agency. It does not authorize or decline prosecution or make recommendations or evaluations.*

In any event, if J. Edgar Hoover is to be used as an authority (and I assuredly believe he should be) then it is appropriate to have something of his of more recent date. In a speech at St. Ignatius Loyola University on November 24, 1964, and reported in the Congressional Record February 8, 1965, he said, among other things:

"The moment has arrived when we must face realistically the startling fact that since 1958 crime in this country has increased five times faster than our population growth. Serious crimes—murder, forcible rape, robbery, burglary, aggravated assault, automobile theft—have mounted steadily since the end of World War II. In 1951 these crimes for the first time topped the 1 million mark, and more than 2¼ million serious crimes were reported during 1963.

"Even more ominous is the fact that this terrifying spiral

in crime has come about through a growing wave of youthful criminality across the Nation. Last year for the 15th consecutive year crimes involving our young people increased over the previous year. For all serious crimes committed in the United States in 1963, youthful offenders were responsible for a staggering 72 percent of the total arrests for these crimes.

''What a grim and unhappy commentary on the moral climate of this great Nation. The moral strength of our Nation has decreased alarmingly. . . .

''These shocking statistics together with the public's apparent indifference to them are indicative of the false morality we are tolerating today. . . .

''*Law and order are the foundations upon which successful government must stand. Without law and order, society will destroy itself.*

''We must never forget that government cannot favor one group or one special interest over its duty to protect the rights of all citizens. We must constantly guard government against the pressure groups which would crush the rights of others under heel in order to achieve their own ends.

''The law of the land is above any individual. All must abide by it. *If we short cut the law, we play a dangerous game which can only result in total defeat for all of us because if we destroy our system of government by law, we destroy our only means of achieving a stable society.*

''Justice has nothing to do with expediency. It has nothing to do with temporary standards. . . .

''Unfortunately and too often humanity, if left to itself, moves along the line of least resistance. That is the reason we make such slow progress, and why we are prone to wait for pathfinders to blaze the way for us to follow. Each of us hopes that beyond the despair and darkness of today there is something better in store for tomorrow. *It will be tragic if nothing but hope is brought to bear on the problem of crime in the United States today.* . . .

''. . . *If we are to reverse the crime picture in this country, we must make a sustained effort to stir the complacent ones to awareness.*

''*We mollycoddle young criminals and release unreformed hoodlums to prey anew on society. The bleeding hearts, particularly among the judiciary, are so concerned for young criminals that they become indifferent to the rights of law-abiding citizens.*

''We must have judges with courage and a high sense

of their duty to protect the public and to adequately penalize criminals if we are to stop the spread of serious and dangerous crimes against society.

"We must adopt a most realistic attitude toward this critical problem. We have tried the lenient approach and it has failed." (Italics added.)

Furthermore, if it is to be inferred from *Dorado* that the rule enunciated there works well in the federal system, I can only think that the one area where they have the federal system exclusively, namely, Washington, D.C., does not commend itself to California. The statistics show, without question, that Washington, D.C. has more aggravated assaults than any city of corresponding size in the United States, where armed marauders prowl the streets at night, where no sensible woman dares walk at nighttime—where an atmosphere of lawlessness even pervades the public schools. And a look at the crime statistics of this area (California) will indicate that ever since the courts apparently have embraced the philosophy of superior rights for inferiors or criminals, the law-abiding public has suffered drastically.

The rights of those accused of crimes should not be paramount and superior to the rights of the decent law-abiding citizens of the community. It is to engage in nothing short of duplicity to say that the rule of *Dorado* will not seriously hamper effective law enforcement in California—and the penalty in effect, as I have heretofore indicated, is visited upon the public.

The police have the right and duty to conduct reasonable interrogations of persons charged with crime—it is a duty they will have, regardless of Supreme Court decisions, and it is totally unrealistic and manifestly unfair and dangerous to expound rules of conduct or procedure to which the police cannot possibly strictly adhere while at the same time performing their duties and fulfilling their responsibilities as expected of them by the decent people of the community.

This business of grasping at anything to support a reversal in a criminal case (the search for error) has gotten to the point of absurdity where justice is perverted and respect for the administration of justice is nil.

If any support is needed for that assertion, I only point to the general disrespect for authority and specifically to the disrespect for the law enforcement officer who is repeatedly assaulted while acting in the line of duty.

I refuse to join in what I think is a most unfortunate

trend of judicial decisions which strain to give the guilty not the same but vastly more protection than the law-abiding citizen receives.

Furthermore, contrary to the rule of *Dorado,* the appellate courts of Illinois, Pennsylvania, Wisconsin, Ohio, Maryland, Nebraska, Nevada, New York and New Jersey have held in effect that the rule of *Escobedo* is as the Supreme Court of the United States stated it, namely, *that the refusal of a suspect's request for counsel is an indispensable condition of the new constitutional rule.*

Admittedly, this so-called newly discovered constitutional right uncovered in *Dorado* is something which no other court in the past 150 years has ever before found. It seems to me that rights which reach constitutional magnitude in 1965 surely must have been of some significance or size sometime during the last 100 years at least to the extent that one appellate court in the land would have observed such a right and so declared it. There is no such opinion in the books which I can find. I am unwilling to attribute to all of the appellate justices of all of the appellate courts of the United States in the past 150 years such blindness.

If the thought is that free and voluntary confessions should no longer be used or available to the prosecution in the trial of cases, it would be far better to so announce in so many words and have done with it. The use of confessions should not, however, by any whittling down process be put out of existence on the installment plan—in other words, the use of confessions should not meet the fate the death penalty has met.

An investigation of criminal activity and the trial of a suspect should be a search for the truth, with all competent and relevant evidence admitted before the trier of fact to the end that justice might prevail and the public be protected. Nothing would be worse than to have no fixed doctrine in the decisions and no precise guidelines for those whose duty it is to enforce the law.

It is an old saying that every criminal ought to have his day in court, and he certainly should have it, but it is nothing short of ridiculous for the appellant in this case, having had his many, many days in court to be turned loose now, not because there is even a remote possibility of his innocence, but to teach the police a lesson.

How refreshing it would seem, and how greatly enhanced the respect for the administration of justice, if appellate

courts would not roam at will in the limitless area of personal beliefs and philosophy, but would make their decrees under the plain language of the constitution.

I respectfully decline to be a coauthor to any decree which is equivalent to an emancipation proclamation to a self-confessed coldblooded, first degree murderer, who, in my opinion, has had the advantage of every legal resource and whose matter does not properly come within the rule of *Escobedo*.

I would affirm the judgment for the third time.

Respondent's petition for a hearing by the Supreme Court was denied May 26, 1965. McComb, J., and Schauer, J.,* were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.