[Crim. No. 7466. In Bank. June 29, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. DANIEL ALLEN ROBERTS, Defendant and Appellant.

THE PEOPLE, Plaintiff and Appellant, v. MAE BLANCHE COLEMAN, Defendant and Respondent.

[Consolidated Appeals.]

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Nancy A. Rossi, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Albert W. Harris, Jr., and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Appellant and Plaintiff and Respondent.

John A. Ertola, under appointment by the Supreme Court, for Defendant and Respondent.

TRAYNOR, C. J.—A jury found the defendants guilty of first degree murder and fixed the penalty at death for Daniel Allen Roberts and life imprisonment for Mae Blanche Coleman. The trial court denied Roberts' motion for new trial but granted Mrs. Coleman's motion on the ground that involuntary statements were admitted in evidence against her. The People's appeal from the order granting Mrs. Coleman a new trial has been consolidated with Roberts' automatic appeal. (Pen. Code, § 1239, subd. (b).)

Mr. and Mrs. Luther Popejoy managed the apartment house in which they lived in San Francisco. At approximately 10 p.m. on June 20, 1962, Popejoy left the building to go to his job at a steel plant. When he returned the next morning he found his wife dead under a bed in their bedroom. She had been strangled, possibly with an electrical extension cord, after having suffered a blow on the nose. The time of death was sometime between 10:30 p.m. on June 20, when she was last seen alive, and 2:30 the following morning. There was testimony that it would have required considerable strength for one person to place the body under the bed. A man's watch, the victim's purse, a pair of red shoes with small steel heels, the rental agreements between the Popejoys and their tenants, and a rent receipt book were missing. There was no evidence that the apartment had been entered forcibly.

Defendants had lived in the apartment house as man and wife for several months. Popejoy testified that on his way to work on the night of the killing he saw them sitting on the front steps of the building. Another tenant testified that he met defendant Roberts in the cellar of the building at approximately 10:30 p.m. that night. Roberts offered him several dozen books of matches, which he was throwing away because he was "cleaning up." Roberts and the witness walked out of the cellar together and separated in front of the victim's door when Roberts said he intended to pay his rent. As the witness walked upstairs Roberts knocked on the door. The victim called, "What do you want at this time of night?" and Roberts said that he wished to pay the rent. The witness saw the victim open her door and Roberts enter the apartment.

The police found Roberts' palmprint on the arm of a chair in the Popejoy apartment and his fingerprint near the bottom of the door between the living room and bedroom. In

the defendants' apartment the police found a radio, two pairs of men's pants, and a note addressed to Roberts signed by Mrs. Coleman stating that she planned to leave him to go to Santa Barbara because he was being unfaithful to her. The card on the defendants' mailbox near the front door of the building with Roberts' name on it was missing.

Charles Roberts, defendant Roberts' brother, was the chief prosecution witness. He testified that he visited the defendants on June 20 at approximately 6 p.m. Defendant Roberts said that he planned to hold up a garment factory at 10 p.m. that evening. Charles agreed to take some of defendants' clothing to his home, and he left with the clothes by a side door at Roberts' direction to avoid being seen by the Popejoys. Charles next saw the defendants when they arrived at his home at approximately 2:30 a.m. on June 21. Roberts then told Charles, "I think I hit her too hard," and in response to Charles' question, "hit who too hard?" Roberts answered, "my landlady." Roberts said that his landlady was under or by the bed. Mrs. Coleman was not present during this conversation. Charles agreed to drive the defendants to Sacramento. On the way Mrs. Coleman said that she had searched the Popejoy apartment and indicated that she had been present when Roberts killed the victim. Mrs. Coleman said she thought it would be best if the victim were dead so that they could not be identified. When they arrived in Sacramento Roberts had Charles pawn a watch that was identified at the trial as the one taken from the Popejoy apartment. They then went to the American River and threw in an electrical cord and a blue purse, which Roberts indicated had come from the Popejoy apartment. Mrs. Coleman told Charles that she had left a note in their apartment designed to mislead the police.

Charles' wife testified that the defendants' clothes were in Charles' automobile on the evening of June 20, that when the defendants arrived at her apartment after midnight that night Mrs. Coleman gave her a pair of black shoes with laces and large wedge heels, and that the defendants left with Charles. When Charles returned the following day he showed her a newspaper story about the killing. He also disposed of the shoes Mrs. Coleman had given her.

In early October 1962 an inspector from the San Francisco Police Department and a San Francisco Assistant District Attorney, armed with warrants for the defendants' arrest for murder, went to Oregon where defendants were being held

on another criminal charge. By that time the police had gathered most of the evidence recited above. The investigators questioned both defendants, and parts of tape recordings of the interrogations were played for the jury.

Roberts told the investigators that he and Mrs. Coleman left the Popejoy apartment house sometime around the middle of June at approximately midnight or 1 a.m. They did not tell Mr. or Mrs. Popejoy that they were leaving. They left because Roberts had no job and had only $17. They hitchhiked to Marysville and then to Oroville, where they caught a freight train to Oregon. Roberts stated that he had not seen Mrs. Popejoy on the day he left San Francisco but that he saw Mr. Popejoy at about 9 p.m. when he and Mrs. Coleman were sitting on the outside steps and Mr. Popejoy left to go to work. He had not been in the Popejoys' apartment on that day and had not been in it since the last time he paid the rent, which he always paid in the daytime and never at night. He had never attempted to pay the rent at night and had never been anywhere near the Popejoy door after Mr. Popejoy had gone to work. He had only been inside the Popejoy apartment at the desk and had never at any time been in the bedroom.

In a separate interview, Mrs. Coleman first told the investigators that she had been living with Roberts for about three months at the Popejoy apartment house before they left San Francisco sometime after June 25. They left at about 3:30 or 4 a.m., hitchhiked to Marysville, and then took a freight train to Oregon. They left because Roberts had violated his parole and they had seen his parole officer in San Francisco. She had not been in the Popejoy apartment the evening before they left. After they saw Mr. Popejoy on his way to work, they went to their apartment where they remained until 2 or 3 a.m. when they left San Francisco.

When the investigators told Mrs. Coleman that they had talked to Roberts' brother Charles and knew how she and Roberts left San Francisco, she admitted that she and Roberts had gone to Charles' apartment at about 3 or 4 a.m. and asked him for a ride to Sacramento. In the morning Charles pawned a guitar and Roberts pawned his watch. She did not see Mrs. Popejoy the evening before and neither she nor Roberts attempted to pay the rent that night. She admitted writing the note left in the kitchen but claimed that she wrote it to make Roberts leave San Francisco. She wrote it about 2 a.m. when Roberts was in the Fillmore district for about two hours. When asked if she had ever seen a pair of

Mrs. Popejoy's shoes, she said that Mrs. Popejoy had given her a pair of black shoes but that she could not remember what she had done with them.

Neither defendant testified at the trial.

Because of the introduction into evidence of defendants' statements and comment by the court and prosecutor on defendants' failure to testify, we requested briefs directed to the question whether the recent decisions of the United States Supreme Court in *Malloy* v. *Hogan*, 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653], and *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], were applicable to this case. In the *Escobedo* case it was held that "where ... [a criminal] investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright*, 372 U.S., at 342 [372 U.S. 335 (83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733)], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (*Escobedo* v. *Illinois*, 378 U.S. 478, 490-491 [84 S.Ct. 1758, 12 L.Ed.2d 977].)

█ Conceding that the investigation into Mrs. Popejoy's murder had focused on defendants, that they were in police custody, that the interrogations by the investigators lent themselves to eliciting incriminating statements, and that incriminating statements were elicited and used against them at the trial, the Attorney General contends that the *Escobedo* case is not controlling because there was no objection to the introduction of the statements into evidence and there is no showing that defendants were not advised of their right to remain silent and no showing that either of them requested and was denied the assistance of counsel.

█ Since this case was tried before the *Escobedo* decision, defendants' failure to object to the admission of their statements into evidence does not preclude their raising the question on appeal. (*People* v. *Hillery*, 62 Cal.2d 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382], and cases cited.) █ The

right to counsel during interrogation does not turn on a request (*People* v. *Dorado*, 62 Cal.2d 338, 347 [42 Cal.Rptr. 169, 398 P.2d 361]), and a waiver of that right and of the right to remain silent cannot be presumed. ■ The burden is therefore on the prosecution to show that a defendant was either informed of these rights or otherwise waived them.[1] (*People* v. *Stewart*, 62 Cal.2d 571, 580-581 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Hillery*, 62 Cal.2d 692, 711-712 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Lilliock*, 62 Cal.2d 618, 621 [43 Cal.Rptr. 699, 401 P.2d 4].) ■ Accordingly, whether or not the trial court erred in holding that Mrs. Coleman's statements were involuntary, it did not err in granting her motion for a new trial.

Since Roberts did not confess to the investigators but only made false exculpatory statements and since the jury was instructed that Mrs. Coleman's statements should be considered only against her, it is contended that the error in admitting their statements into evidence was not prejudicial to Roberts. (See *People* v. *Parham*, 60 Cal.2d 378, 385-386 [33 Cal.Rptr. 497, 384 P.2d 1001]; cf. *People* v. *Dorado*, 62 Cal.2d 338, 356-357 [42 Cal.Rptr. 169, 398 P.2d 361].) This error cannot be considered alone, however, for the court and prosecutor also erred in commenting on defendants' failure to testify. ■ It is now settled that such comment violates the Fifth Amendment as made applicable to the states by the Fourteenth Amendment to the United States Constitution. (*Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]; see also *Malloy* v. *Hogan*, 378 U.S. 1 [84 S.Ct. 1758, 12 L.Ed.2d 653].)

■ Except for Charles' testimony of defendants' oral admissions to him, the evidence was almost wholly circumstantial. It was the defense theory that the circumstances were consistent with innocence, or at most second degree murder, and that as a possible participant in the crime, Charles was unworthy of belief. Charles was familiar with the Popejoy apartment house, said he was there on the evening of June 20, and knew that defendants were planning

[1] The record affirmatively shows that defendant Roberts requested counsel and did not waive his rights. The tape recording of his interview with the investigators began before they introduced themselves to him and continued until the end of the questioning. At no time did they inform Roberts of his rights. Moreover, he repeatedly stated to the investigators that he wished to answer questions only in the presence of an attorney. Despite these protests, the investigators persisted in questioning him and succeeded in eliciting statements that were used against him at the trial.

to leave town. He pawned Mr. Popejoy's watch and threw the other things allegedly taken from the apartment into the river. He at first denied any knowledge of the crime, and only implicated defendants after the police learned that he had pawned the watch. Thus, Charles had an obvious interest in directing suspicion away from himself. Roberts' entry into Mrs. Popejoy's apartment in full view of another tenant was not consistent with a preexisting plan to rob or kill, and the jury might well have entertained at least a reasonable doubt whether Roberts was guilty of first degree murder had the prosecution not been allowed to prove that both he and Mrs. Coleman lied to the police and had the court and prosecutor not commented on their failure to testify.

In his argument to the jury the prosecutor repeatedly stressed defendants' lies[2] as evidence of consciousness of guilt that destroyed any innocent interpretation that might be placed upon the other evidence, and he asserted that the lies were part of a prearranged plan of Roberts and Mrs. Coleman to mislead the police.

Moreover, the inadmissible statements were not merely repetitions of similar admissible statements. Accordingly, it cannot be determined what impact their erroneous admission may have had on Roberts' decision not to testify. The prose-

---

[2]For example: ''Well, we know that ultimately both of these defendants were captured in Oregon. We know that, don't we? And at that time the frame of mind of Daniel Roberts, I suppose, should have been, 'Well, I am caught. My parole has been violated. O.K. I give up now. That is it.'

''And if you asked him then . . . 'Well, how did you get away that night,' he could have said easily, 'Well, I went out to Charles and he drove me to Sacramento.' Or he could have said, 'Well, we went to Sacramento.'

'' 'Did you go to see Mrs. Popejoy that night?' He could have easily said, 'Well, yes, I did. I did, yes.'

'' 'Did you see Charles that night?' He should have replied, 'Well, yes, I saw Charles that night.'

''Instead, what did he say? Here is a man that tries to tell you that he has nothing to do with this murder, that the only reason that he fled was his violation of parole. In effect, he should be in a position of saying, 'Well, there is nothing more to lie about now. I am caught. My parole has been violated. You have me now. There is no reason to lie.' And yet he does. He lies about his prints. He lies about going to Marysville. He lies about seeing Charles that night. He lies about being near her apartment that night or going in her apartment that night. He lies about seeing her that night. And the question comes into your mind, 'Why?'

''Here is a man who has nothing to run from any more. His parole is violated. He is captured. And he lies once, twice, three times, and lies some more. And the question comes up, 'Well, what is this man lying for? What for? What does he know? What is he trying to conceal?' ''

cutor took full advantage of that decision by forcefully commenting on it in his argument,[3] as he then reasonably assumed he was entitled to do. (Cal. Const., art. I, § 13; *People* v. *Adamson,* 27 Cal.2d 478 [165 P.2d 3]; *Adamson* v. *California,* 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].) With evidence before the jury that he had repeatedly lied to the police, Roberts and his trial counsel may have concluded that it would be futile for Roberts to attempt to exculpate himself by testifying to other exculpatory facts even if they were true. Had he not been deprived of his right to counsel during interrogation, he might have been advised to say nothing or to tell the truth if he was innocent or guilty of only second degree murder, even though the truth might have appeared to him as less exculpatory than false

[3] For example: "So they ask you, 'Disbelieve Charles,' they say to you, 'Disbelieve him.' They don't take the stand under oath and tell you he lied. These are the people who could tell you that he lied, if he did so. They do not do so. They ask you to disbelieve because he made some inconsistencies. . . .

"Shouldn't you say, 'At least, if I am asked as a logical person to reject his testimony, I should have liked to have heard the testimony of one of those two defendants or both; I should have liked to have at least have heard them say one thing, "I didn't kill Mrs. Popejoy."' '

"I should think you might want to hear perhaps a little more and say something about, 'I didn't throw a cord in the river.' But, no, you are not accorded that privilege, and the defendants need not take the stand. I don't mean to conclude, ladies and gentlemen of the jury, for one moment that they need to take the stand, or that they should, or that you should conclude just even for a moment that they are guilty by not taking the stand, because, thank God, in America no one need get up . . . there and hang himself, and I, for one, believe in this law. The prosecutor must prove his case to you beyond a reasonable doubt, and this is good law and this is what I am trying to do. I don't think we should have to rely on their testimony to convict them, and the law promises this, and I agree to it.

"But they sit here with so much knowledge within their grasp and deny you that; you can conclude that, in fact, Charles Roberts and these other witnesses like McKinley Brown, in fact, did tell the truth. You can at least logically do this . . . .

" . . . [Counsel for Roberts] says, after all, he says, my client, you know, has been convicted of a felony and if he took the stand, you wouldn't believe him anyway, because he would stand impeached.

"What sort of an explanation is that? What sort of a substitution is that for offering you at least evidence, for having at least this much come from the mouth of the defendant . . . Daniel Roberts, under oath?

"One, the motive for Charles to lie; two, to tell you he didn't kill Mrs. Popejoy, under oath, 'I didn't kill Mrs. Popejoy.' Three, 'I was with Dora.' And who is Dora; and how can she be located? If he just said this, but he didn't say anything like that. I want to bring it very clearly forward to you, ladies and gentlemen of the jury, that you are not to imply if a defendant, a man who doesn't take the stand, he is guilty. But a man who doesn't take the stand to testify, I suppose, to at least this extent, does not dispute the facts that have been presented by the prosecution. . . ."

denials of any incriminating facts. He was induced at a critical stage in the proceedings to make choices that he could make intelligently only with the advice of counsel. (*Escobedo* v. *Illinois,* 378 U.S. 478, 486 [84 S.Ct. 1758, 12 L.Ed.2d 977] ; see *Hamilton* v. *Alabama,* 368 U.S. 52, 55 [82 S.Ct. 157, 7 L.Ed.2d 114] ; *White* v. *Maryland,* 373 U.S. 59, 60 [83 S.Ct. 1050, 10 L.Ed.2d 193] ; *Glasser* v. *United States,* 315 U.S. 60, 75-76 [62 S.Ct. 457, 86 L.Ed. 680] ; *Williams* v. *Kaiser,* 323 U.S. 471, 475-476 [65 S.Ct. 363, 89 L.Ed. 398] ; cf. *People* v. *Gaines,* 58 Cal.2d 630, 644 [25 Cal.Rptr. 448, 375 P.2d 296] [dissenting opinion].)

After reviewing the entire record in the light of all the foregoing considerations, we are of the opinion that it is reasonably probable that a result more favorable to Roberts would have been reached had defendants' statements not been erroneously admitted into evidence and had the court and prosecutor not commented on their failure to testify. Accordingly, the judgment must be reversed. (See Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243] ; *People* v. *Bostick,* 62 Cal.2d 820, 823-826 [44 Cal.Rptr. 649, 402 P.2d 529].)

The reversal of Roberts' conviction is compelled by the *Griffin* case and by the *Escobedo* case regardless of whether a request for counsel during interrogation is controlling. Roberts repeatedly stated to the investigators that he wished to answer questions only in the presence of an attorney. Despite these protests, the investigators persisted in questioning him and succeeded in eliciting statements that were introduced into evidence against him. The prosecutor vigorously urged in argument that those statements and Roberts' failure to testify destroyed his defense.

The trial court granted Mrs. Coleman's motion for a new trial on the ground that her statements were involuntary and clearly prejudcial. Since her statements are also inadmissible under the rules set forth in the *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], *People* v. *Hillery,* 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382], and *People* v. *Lilliock,* 62 Cal.2d 618 [43 Cal.Rptr. 699, 401 P.2d 4], and since the court and prosecutor also erred in commenting on her failure to testify, we need not and have not determined whether the trial court correctly ruled that her statements were involuntary. The reasons and authorities set forth at length after the hearing and re-

hearing in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], compelled this court, as they have other courts,[4] in being faithful to the Constitution of the United States as interpreted by the United States Supreme Court, to hold that the rule of the *Escobedo* case does not depend upon a request for counsel.

The order granting defendant Coleman a new trial is affirmed. The judgment is reversed.

Peters, J., Tobriner, J., Peek, J., and Dooling, J.,* concurred.

SCHAUER, J.,* Concurring and Dissenting.—In this case each defendant moved for a new trial. The trial court denied the motion of defendant Roberts but granted that of defendant Coleman.

Because of those attributes of our judicial system which are indigenous to the trial process (and which are adumbrated in my dissent in *People* v. *Davis* (1965) 62 Cal.2d 791, 801-802 [44 Cal.Rptr. 454, 402 P.2d 142]) I recognize that the trial judge is in a position far superior to a justice of this court in resolving factual issues. These issues encompass the pivotal one as to the existence or nonexistence of the constitutionally defined basis without which the court is peremptorily forbidden to grant a new trial (or, on appeal, to reverse a judgment).

By "constitutionally defined basis" I refer to that articulated by California Constitution, article VI, section 4½,[1] interpreted in *People* v. *Watson* (1956) 46 Cal.2d 818, 835-836 [12] [299 P.2d 243]. It is, of course, true that the subject section of the Constitution "should control the action of the trial court in considering a motion for a new trial, but when the trial court has . . . granted the motion, the sole issue be-

---

[4]*Clifton* v. *United States,* 341 F.2d 649, 653; *United States* ex rel. *Russo* v. *New Jersey,* 351 F.2d 429; *Galarza Cruz* v. *Delgado,* 233 F. Supp. 944; *United States* ex rel. *Rivers* v. *Myers,* 240 F.Supp. 39, 43; *State* v. *Dufour,* —— R.I. —— [206 A.2d 82, 85]; *State* v. *Neely,* 239 Ore. 487 [398 P.2d 482].

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

---

[1]"Sec. 4½. No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

fore the appellate court is whether the trial court has abused its discretion." (*Brandelius* v. *City & County of San Francisco* (1957) 47 Cal.2d 729, 744 [18] [306 P.2d 432].)

I do not find that the trial court abused its discretion in denying the motion of defendant Roberts. Furthermore, assuming (only for the purposes of this dissenting and concurring opinion) the errors declared by the majority, I am not of the view (in the light of the entire record) that a result more favorable to defendant Roberts would have been reached in the absence of those errors. Accordingly, I dissent from the majority's reversal of, and would affirm, the judgment against Roberts. (See Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 835-836 [12] [299 P.2d 243].)

In respect to defendant Coleman, from my disadvantageous position factwise, I cannot validly conclude that the trial court as a matter of law abused its discretion in granting her motion for a new trial. Accordingly, I concur with the majority in affirming that order.

McCOMB, J.—I dissent. I would reverse the order granting defendant Coleman a new trial and would affirm the judgment of first degree murder fixing the penalty at death as to defendant Roberts.

After an examination of the record, I am not of the opinion that it is reasonably probable that a result more favorable to defendants would have been reached in the absence of the errors complained of. (Cal. Const., art. VI, § 4½; see concurring and dissenting opinions in *In re Shipp,* 62 Cal.2d 547 [43 Cal.Rptr. 3, 399 P.2d 571], *People* v. *Modesto,* 62 Cal.2d 436, 464 [42 Cal.Rptr. 417, 398 P.2d 753], and *People* v. *Hines,* 61 Cal.2d 164, 175, 183 [37 Cal.Rptr. 622, 390 P.2d 398]; and dissenting opinions in *People* v. *Dorado,* 62 Cal.2d 338, 361-364 [42 Cal.Rptr. 169, 398 P.2d 361].)

My views on the legal principles involved in cases such as this are accurately and realistically expressed by Mr. Justice Fourt in his dissenting opinion in *People* v. *Benavidez,* 233 Cal.App.2d 303, 307 et seq. [43 Cal.Rptr. 577], filed on March 30, 1965.

The defendant in that case was convicted in 1959 of first degree murder and sentenced to life imprisonment; his conviction was affirmed by the District Court of Appeal, and this court unanimously denied a hearing. In April 1964, about a year after *Douglas* v. *California,* 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811], was decided, the District Court of Appeal was compelled to vacate its judgment because the defendant

had not been represented by counsel on appeal. Counsel was then appointed, the appellate court again reviewed the record, and affirmed the judgment for the second time.

After *Escobedo,* we granted the defendant's petition for a hearing and retransferred the case to the District Court of Appeal for reconsideration in light of that decision.

Upon reviewing the case for the third time, two members of the three-member District Court of Appeal felt compelled, six years after conviction, to reverse on the authority of *Escobedo* and this court's decision in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], in spite of the fact that the defendant had voluntarily confessed to having committed a cold-blooded murder in the perpetration of robbery and had had the advantage of every legal resource.

While the long history of review of the *Benavidez* conviction makes a reversal more appalling than in the present case, Justice Fourt analyzes the problems faced by law enforcement officers when appellate courts, with apparent indifference to the rights of law-abiding citizens, move the rules of formal court procedure back to the police station and reverse convictions where there has been no miscarriage of justice. His dissent is quoted, in part:

" . . . In effect, a policeman, under the rule set forth [*Dorado* rule], when he thinks he has a prime suspect in custody must proceed to arraign the suspect for further questioning—and if the policeman does not so properly arraign the suspect, even a full, complete and voluntary confession of the suspect made within two minutes thereafter is not admissible at the trial. And this is done apparently (not to protect an innocent person) but to punish the police for a failure to perform their duty—but the net result is that a dangerous criminal is turned loose onto society and decent people are at the mercy of that dangerous criminal until he is caught in some other crime of violence.

"A Pandora's box of confusion, uncertainty, disarray and discord is unleashed by such a decree. For example, the law books are full of cases where committing judges, trial judges and others have proceeded in cases with the understanding of all concerned that there was a sufficient, proper and legal waiver of some particular right by a defendant (such as a public trial, jury trial, delay in trial, delay in pronouncing judgment, appointment of counsel, jury challenge, etc.) and which later have been reversed by an appellate court because some justice thought that the judge of the lower court had misinterpreted the evidence of waiver. Can anyone imagine how

many criminals in the future will swear (even though an officer has fully complied with the law of *Dorado*) to the effect that they did not really understand that they were waiving any rights, that they did not hear what the policemen had to say, that they were emotionally disturbed at the time and did not really mean to waive any rights. Furthermore, it can easily be seen in the light of the fact that no workable rule is or can be laid down as to what constitutes a proper waiver and as a consequence every police officer necessarily will be practically on his own. In other words, the court says, in effect, that it will nullify the policeman's efforts and the results obtained therefrom if he does not meet the standards of the court, but the court refuses to tell the policeman in advance what the standards are. Could anyone design a better formula for handcuffing the police? Query: does the suspect have to make a declaration of waiver, or can he impliedly waive? What is the standard a policeman is to use in coming to a conclusion as to whether a suspect has intelligently and understandably waived his rights to keep still—keeping in mind, of course, that the waiver must depend upon the particular facts and circumstances of each case, including the background, experience and conduct of the suspect?

"Heretofore the courts have thought that 'the serious and weighty responsibility' of making a determination as to whether there was a waiver of a substantial right was lodged in the trial judge. (*Johnson* v. *Zerbst*, 304 U.S. 458, 465 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357].) Now, apparently, the policeman is supposed to make the determination as to whether and when the suspect makes an intelligent and knowledgeable waiver. The simple stating of the proposition makes it clear that the successful interrogation of suspects will be next to impossible under any such rule.

"The Supreme Court of the United States has in the past ruled to the effect that there was no constitutional right of a suspect to be advised of his right to counsel or of his right to remain silent. (*Haynes* v. *Washington*, 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513]; *Crooker* v. *California*, 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448]; *Cicenia* v. *Lagay*, 357 U.S. 504 [78 S.Ct. 1297, 2 L.Ed.2d 1523].) Likewise, our Supreme Court has heretofore similarly held in *People* v. *Ditson*, 57 Cal.2d 415 [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Garner*, 57 Cal.2d 135 [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Kendrick*, 56 Cal.2d 71 [14 Cal.Rptr. 13, 363 P.2d 13]; and *People* v. *Crooker*, 47 Cal.2d 348 [303 P.2d 753].

"Under *Dorado* policemen who ordinarily are not required to be learned and skilled in constitutional law now have the burden of advising suspects of their constitutional rights, and they must do so at just the right moment in the proceedings, otherwise the probabilities are extremely great that a self-confessed violent criminal will be turned loose. It appears that any court, at the very least, should look at the totality of the circumstances in the police procedure to determine whether there was fundamental fairness; even under those circumstances there would be no well-defined guide lines for a policeman to follow. There should never be a situation, however, where a coldblooded, robbing, murderer in the face of a mountain of conclusive evidence against him may be released into society solely because the police failed to comply with a rule which was nonexistent at the time of the investigation and the trial—and particularly so where the reversal is not upon the theory that possibly the defendant is innocent.

"A hearing before a judicial officer in a judicial proceeding is one thing—a police investigation is something else. The rules of evidence should, of course, prevail in the judicial proceeding, but certainly not in the police interrogation process. The next step might well be to promulgate a rule to the effect that the police cannot consider hearsay evidence in their investigations. Query: what occurs in the event a suspect asks for a named attorney and the police secure that named attorney for the defendant and the suspect later claims that the attorney was ineffective, and, therefore, was no attorney at all—is the free and voluntary confession of the suspect made after he had talked to the named attorney to be admitted or rejected because counsel was supposedly ineffective? Is there to be a presumption that any suspect who confesses after seeing his attorney has an ineffective attorney?

"Assume that a crime has been committed, and the police arrest a prime suspect and have him in custody and the suspect wants to talk to his attorney A (who has represented him in several other criminal trials) but A is out of the country on a vacation at the time and will not be back for 30 days—what do the police do—is the investigation at a standstill and stalemate—and if the suspect confesses in the meantime and before the attorney returns, is the confession admissible into evidence?

"The police, as I understand it, are representatives of the executive arm of the government—there to enforce the law as written, to protect and to serve the community. Why should an officer be insulated from talking to a suspect? There seems

to be expressed in both *Escobedo* and *Dorado* a veiled distrust of the police. As heretofore indicated, police are but the representatives of the public and the presumption is that they perform their duties faithfully and well, and the records bear out the fact that they do their jobs extremly well considering the judge-made hurdles which have been put into their paths. The fact that police work is not performed in public view should be of no particular consequence, for by the nature of things, it has to be so conducted—the work of the police is to ferret out crime and to keep the community a safe place for its residents. It may be distasteful to have police at all or to have them investigating and questioning—on the other hand, it is more distasteful to be unable to walk on an ordinary street in a city without fear of violence being committed to your person or property. If people committed no crime, there would be little need for policemen. But be that as it may, the judicial attitude of this state seems entirely unrealistic as to conditions as they exist insofar as the police are concerned.

''In *Dorado* the court waves aside any forebodings of law enforcement officials as to the effect of its ruling. The court cites as authority, in part, for its position a statement in an article by J. Edgar Hoover in a 1951-1952 Iowa Law Review (p. 182) where Hoover said:

'' 'Agents are taught that any suspect or arrested person, at the outset of an interview, must be advised that he is not required to make a statement and that any statement given can be used against him in court. Moreover, the individual must be informed that, if he desires, he may obtain the services of an attorney of his own choice. Duress or brutality of any type is absolutely forbidden. Any Special Agent guilty of such conduct is subject to immediate dismissal from the service. The highest ethics of law enforcement become part of the Special Agent's credo. Nothing less can be accepted.'

''Hoover also pointed out in that article that the F.B.I. *is not a police force*—it is the *investigative* arm of the Department of Justice, *is strictly a fact-finding agency. It does not authorize or decline prosecution or make recommendations or evaluations.*

''In any event, if J. Edgar Hoover is to be used as an authority (and I assuredly believe he should be) then it is appropriate to have something of his of more recent date. In a speech at St. Ignatius Loyola University on November 24, 1964, and reported in the Congressional Record February 8, 1965, he said, among other things:

'' 'The moment has arrived when we must face realistically

the startling fact that since 1958 crime in this country has increased five times faster than our population growth. Serious crimes—murder, forcible rape, robbery, burglary, aggravated assault, automobile theft—have mounted steadily since the end of World War II. In 1951 these crimes for the first time topped the 1 million mark, and more than 2¼ million serious crimes were reported during 1963.

" 'Even more ominous is the fact that this terrifying spiral in crime has come about through a growing wave of youthful criminality across the Nation. Last year for the 15th consecutive year crimes involving our young people increased over the previous year. For all serious crimes committed in the United States in 1963, youthful offenders were responsible for a staggering 72 percent of the total arrests for these crimes.

" 'What a grim and unhappy commentary on the moral climate of this great Nation. The moral strength of our Nation has decreased alarmingly. . . .

" 'These shocking statistics together with the public's apparent indifference to them are indicative of the false morality we are tolerating today. . . .

" '*Law and order are the foundations upon which successful government must stand. Without law and order, society will destroy itself.*

" 'We must never forget that government cannot favor one group or one special interest over its duty to protect the rights of all citizens. We must constantly guard government against the pressure groups which would crush the rights of others under heel in order to achieve their own ends.

" 'The law of the land is above any individual. All must abide by it. *If we short cut the law, we play a dangerous game which can only result in total defeat for all of us because if we destroy our system of government by law, we destroy our only means of achieving a stable society.* . . .

" 'Justice has nothing to do with expediency. It has nothing to do with temporary standards . . . .

" 'Unfortunately and too often humanity, if left to itself, moves along the line of least resistance. That is the reason we make such slow progress, and why we are prone to wait for pathfinders to blaze the way for us to follow. Each of us hopes that beyond the despair and darkness of today there is something better in store for tomorrow. *It will be tragic if nothing but hope is brought to bear on the problem of crime in the United States today.* . . .

" '. . . *If we are to reverse the crime picture in this country,*

*we must make a sustained effort to stir the complacent ones to awareness.*

" 'We mollycoddle young criminals and release unreformed hoodlums to prey anew on society. The bleeding hearts, particularly among the judiciary, are so concerned for young criminals that they become indifferent to the rights of law-abiding citizens.

" 'We must have judges with courage and a high sense of their duty to protect the public and to adequately penalize criminals if we are to stop the spread of serious and dangerous crimes against society.

" 'We must adopt a most realistic attitude toward this critical problem. We have tried the lenient approach and it has failed.' (Italics added.)

"Furthermore, if it is to be inferred from *Dorado* that the rule enunciated there works well in the federal system, I can only think that the one area where they have the federal system exclusively, namely, Washington, D.C., does not commend itself to California. The statistics show, without question, that Washington, D.C. has more aggravated assaults than any city of corresponding size in the United States, where armed marauders prowl the streets at night, where no sensible woman dares walk at nighttime—where an atmosphere of lawlessness even pervades the public schools. And a look at the crime statistics of this area (California) will indicate that ever since the courts apparently have embraced the philosophy of superior rights for inferiors or criminals, the law-abiding public has suffered drastically.

"The rights of those accused of crimes should not be paramount and superior to the rights of the decent law-abiding citizens of the community. It is to engage in nothing short of duplicity to say that the rule of *Dorado* will not seriously hamper effective law enforcement in California—and the penalty in effect, as I have heretofore indicated, is visited upon the public.

"The police have the right and duty to conduct reasonable interrogations of persons charged with crime—it is a duty they will have, regardless of Supreme Court decisions, and it is totally unrealistic and manifestly unfair and dangerous to expound rules of conduct or procedure to which the police cannot possibly strictly adhere while at the same time performing their duties and fulfilling their responsibilities as expected of them by the decent people of the community.

"This business of grasping at anything to support a reversal in a criminal case (the search for error) has gotten to the point

of absurdity where justice is perverted and respect for the administration of justice is nil.

"If any support is needed for that assertion, I only point to the general disrespect for authority and specifically to the disrespect for the law enforcement officer who is repeatedly assaulted while acting in the line of duty.

"I refuse to join in what I think is a most unfortunate trend of judicial decisions which strain to give the guilty not the same but vastly more protection than the law-abiding citizen receives.

"Furthermore, contrary to the rule of *Dorado,* the appellate courts of Illinois, Pennsylvania, Wisconsin, Ohio, Maryland, Nebraska, Nevada, New York and New Jersey have held in effect that the rule of *Escobedo* is as the Supreme Court of the United States stated it, namely *that the refusal of a suspect's request for counsel is an indispensable condition of the new constitutional rule.*

"Admittedly, this so-called newly discovered constitutional right uncovered in *Dorado* is something which no other court in the past 150 years has ever before found. It seems to me that rights which reach constitutional magnitude in 1965 surely must have been of some significance or size sometime during the last 100 years at least to the extent that one appellate court in the land would have observed such a right and so declared it. There is no such opinion in the books which I can find. I am unwilling to attribute to all of the appellate justices of all of the appellate courts of the United States in the past 150 years such blindness.

"If the thought is that free and voluntary confessions should no longer be used or available to the prosecution in the trial of cases, it would be far better to so announce in so many words and have done with it. The use of confessions should not, however, by any whittling down process be put out of existence on the installment plan—in other words, the use of confessions should not meet the fate the death penalty has met.

"An investigation of criminal activity and the trial of a suspect should be a search for the truth, with all competent and relevant evidence admitted before the trier of fact to the end that justice might prevail and the public be protected. Nothing could be worse than to have no fixed doctrine in the decisions and no precise guidelines for those whose duty it is to enforce the law.

"It is an old saying that every criminal ought to have his

day in court, and he certainly should have it, but it is nothing short of ridiculous for the appellant in this case, having had his many, many days in court to be turned loose now, not because there is even a remote possibility of his innocence, but to teach the police a lesson.

''How refreshing it would seem, and how greatly enhanced the respect for the administration of justice, if appellate courts would not roam at will in the limitless area of personal beliefs and philosophy, but would make their decrees under the plain language of the Constitution.''