[Crim. No. 163. Fifth Dist. Sept. 29, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK LOUIS PARRIERA, Defendant and Appellant.

Cardozo, Trimbur & Nickerson, A. A. Cardozo, Jr., and Gary S. Davis for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edward A. Hinz, Jr., and Edsel W. Haws, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—Frank Louis Parriera appeals from a conviction of attempted murder in the second degree of his wife, Emilia F. Parriera, while he was armed with a deadly weapon, to-wit: a .22 caliber Rigarmi automatic pistol.

At all times during the trial, defendant denied that he was guilty, his defense being that Mrs. Parriera attempted to take her own life. There were no eyewitnesses except Mr. and Mrs. Parriera; appellant maintained that at the time of the alleged offense he was asleep in bed with his wife when he was awakened by the report of a pistol, and discovered that she had attempted to shoot herself with his weapon. Uncontradicted evidence shows that Mrs. Parriera had been mentally and emotionally disturbed for a long period of time, and that she had threatened to put Mr. Parriera in prison, or the death house, because of a love affair between him and a Daisy van Zwaluwenburg; there was evidence by two reliable witnesses that, after the shooting, Mrs. Parriera admitted that she herself had done it; however, aside from these statements by her in the presence of two nurses at the hospital, she consistently urged that her husband was guilty of an attempt to murder her.

The defendant lived with his wife and their daughters, Bernadette, 18, and Veronica and Genevieve, 12-year-old twins, at 365 Maxwell, in Oakdale; a fourth daughter, Deanna, had married and was living apart from the family home.

Two main elements in the relationship of the defendant and the complaining witness exercised a strong influence over the trial. One was the fact that Mrs. Parriera had been mentally and emotionally ill for a long period of time, so much so that she had been incarcerated in a sanitarium at Livermore for

a period some years before the shooting, and that she had received treatment from a psychiatrist and her family doctor for very evident departure from the norm insofar as mental manifestations were concerned; one medical man referred to her condition as manic depressive psychosis, and another one termed her mental condition schizophrenic. Several witnesses said that there were times when she apparently paid no attention to what they said to her and seemed to be engrossed in a mental state of her own. There was evidence that she constantly scribbled letters and messages to others at unusual times and testimony that she wrote letters to the Pope and composed unmailed letters to the parish priest with the concept of a mystic marriage between them and setting forth facts that were outlandishly bizarre. In his argument, the district attorney said: ''. . . there is no question that Mrs. Parriera is mentally ill. And I would be the last to argue that point because . . . we would concede that she is mentally ill. There is no question about it. The evidence is clear on that point.'' The second factor which exercised an extraordinary influence over the trial was the fact that for the previous four or five years Mr. Parriera had conducted an active love affair with Daisy van Zwaluwenburg, and that this fact and many of the details were known to Mrs. Parriera and were tremendously resented by her to the point that she attacked her husband's mistress in public and made various threats against the lovers.

On the night of August 7, 1964, Mrs. Parreira, the twins, Bernadette, and her friend, Herkie Vieira, drove to the home of Mrs. Parriera's mother in Stockton for a visit. Appellant was not with them but was working at the Power Thrust gasoline station in Modesto. The group returned from Stockton to their Oakdale home at around midnight; Mr. Parriera was not yet home. Mrs. Parriera went to bed around 1 a.m. She testified that she was very restless.

Defendant arrived sometime after 1:30 a.m. He drank some coffee and ate a sandwich in the kitchen, went to the bathroom, sat on the edge of the bed briefly to read an article in the newspaper, took off his glasses and put them on the same bureau where he placed his gun in an upper drawer. He had purchased this weapon sometime before as a protection against thievery at the gasoline station and carried it into the house in his left front pocket. He was wearing only a T-shirt when he went to bed. His wife was lying on her stomach with her face toward the wall. Defendant turned off the light. In a few minutes, Mrs. Parriera arose, picked up an electric clock

and took it into Bernadette's room so that she could be awakened at a proper hour in the morning to carry on work at a neighbor's. Mrs. Parriera then went to the bathroom and returned to bed lying on the right side of Mr. Parriera. He testified that his wife got up a second time and went to the drawer of the bureau where he assumed that, as she frequently did, she took a handkerchief out of that chest of drawers; he went to sleep and the next sound that he said he heard was the bang or bounce of the discharging gun; he sat up immediately and attempted to light the electric lamp at the head of the bed, but was not able to. His wife was trying to get up, moving her left hand about, and saying, "I'm shot." Mrs. Parriera testified that she called to her daughter, Bernadette, who was in bed in another room, and that as she raised herself she felt what she thought was a finger and the gun sliding across the palm of her left hand. Bernadette heard the shot shortly before 6 o'clock, and testified that she heard her mother scream, "Bernie, Bernie, he shot me. Come quick."

The evidence shows that for several years before the shooting the defendant and Mrs. van Zwaluwenburg had been carrying on a love affair, which became more serious with time, so much so that on the night before the shooting he told her that he intended to leave home and get a separate place to live in Modesto. She urged him not to go home at all that night, but he said that he needed to get his clothes and would, as usual, sleep at his house.

The appellant presents three main contentions for reversal:

1) That during the trial errors in law occurred which resulted in a miscarriage of justice; although appellant discusses at some length five alleged errors, there are only two which deserve closely applied consideration and which would necessitate a reversal of the judgment if the points are well taken;

2) That, in questioning witnesses and in his argument to the jury, the district attorney was guilty of prejudicial misconduct; and

3) That there was insufficient evidence to justify the verdict, in this connection, citing *People* v. *Hall*, 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700].

We can quickly dispose of the last point. If Mrs. Parriera's testimony is believed, there can be no question of the sufficiency of the evidence to support the verdict. She stated that the defendant shot her, and the wound as to location and seriousness justifies the inference that the person who discharged the gun intended to kill.

Turning to two of the claimed errors, under the first ground for reversal above mentioned, we find: an alleged violation of the constitutional rule enunciated in the cases of *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and an alleged unjustified restriction by the trial court of the effect of the evidence of two witnesses that Mrs. Parriera admitted that she had shot herself.

On the morning of the shooting, Sergeant Riley of the Oakdale police arrested the defendant and took him to the police station and repeatedly questioned him concerning the alleged crime without advising him of his constitutional rights, namely, he did not tell him that he could remain silent or that he could have an attorney at all stages of the case, including the period when questioned. Finally, Mr. Parriera made what, under the state's contention, constituted a confession. He was asked repeatedly whether he had shot his wife; he emphatically denied the accusation, but the police officer insistently repeated the essential inquiry, and he ultimately said in effect, "I have denied it. I have told the truth, but you keep saying that I did it. If you say that I did it, I must have done it." The defense contends that this statement was actually tinged with sarcasm and meant "I was there. I know what I am talking about. I have denied it, and do deny it, but, if you purport to have more knowledge than an eyewitness, what you say must be correct." In any event, from the standpoint of the prosecution, this statement was actually and literally a confession, and, therefore, the test of whether it could be introduced in evidence is correctly set out in the *Dorado* and *Escobedo* cases. The trial court ruled that this evidence could not be received at the time it was offered as part of the prosecution's case, but, after the defendant had taken the stand in his own defense and denied the shooting the district attorney again offered the evidence on the theory that, although it had not been available previously, it could be used for impeachment purposes on cross-examination of the defendant, and that Mr. Parriera had waived the protection of the constitutional right by taking the stand.

The record shows that the following proceedings took place at that time:

"THE COURT: Let the record show the presence of the parties.

"There is no decisive case upon this question right now. It might be looked upon as defending the purpose of the ruling

of the Dorado case to not permit the cross examination upon the matter stated by the Defendant after the suspicion had focused upon him as I have already ruled it has.

"On the other hand, it seems inconsistent for a person who takes the stand and he knows he's subjecting himself to cross examination, if he had been convicted of a felony, and all those hazards could be developed. So I am going to let it in.

"MR. CARDOZO: Your Honor, could I say something?

"THE COURT: Sure, certainly.

"MR. CARDOZO: Judge, the reason this statement was kept out was under the Dorado decision because of the fact that he was not advised of his rights and he did not have an attorney at that time. Now, under the Dorado—Escobido [sic] versus Illinois decisions, the reason for this is because he didn't have any counsel at that time, wasn't advised that he could have counsel. Now, if this is the case here, then, we're letting something in that was ruled out and the premise is still this. Just because he got an attorney later doesn't make any difference. And the fact that he's on the stand to testify now doesn't cure this defect whatsoever.

"THE COURT: Here's the situation, Mr. Wolfe, and if I'm wrong on this ruling, you'll have a reversal. Now, if you want to go ahead and take that chance—you want to try this case without it?

"MR. WOLFE: I would just as soon take that chance."

Through the witness, Sergeant Samuel J. Riley, recalled to the stand after the defendant had testified in his own behalf, the following evidence was permitted by the court:

"MR. WOLFE: Q. Would you tell us, now, Sergeant Riley, what question you asked and the answer that was given? A. Mr. Moorad just directed the question to him 'And, Mr. Parriera, did you shoot your wife with this automatic?'

"Q. And what did the Defendant say to that? A. He said, 'I didn't. I guess so, if you say so.'"

■ There can be no question that the constitutional right to be advised by a law enforcement officer prior to questioning that he could remain silent and could have an attorney, and that a confession without such advice was inadmissible, was not a temporary and evanescent thing, but persisted throughout the trial. By taking the witness stand in his own defense, a defendant does not waive this constitutional right. (*People* v. *Green*, 236 Cal.App.2d 1, 16 [45 Cal.Rptr. 744].)

■ The "confession" in this case was undoubtedly a prominent feature of the trial (*Stroble* v. *California*, 343 U.S.

181 [72 S.Ct. 599, 96 L.Ed. 872]). And there was ". . . a reasonable possibility that the evidence complained of might have contributed to the conviction" (*Fahy* v. *Connecticut*, 375 U.S. 85, 86 [84 S.Ct. 229, 11 L.Ed.2d 171]). The statement of the defendant was elicited after the investigation had focused upon him during a process of interrogation which lent itself to obtaining a confession or incriminating admissions (*Escobedo* v. *Illinois, supra*, 378 U.S. 478; *People* v. *Dorado, supra*, 62 Cal.2d 338). The damage done to the defendant by the admission of this evidence constituted, in our opinion, a miscarriage of justice.

 This breach of the constitutional rights of the defendant was not cured by the fact that he answered the further question of a deputy district attorney with reference to what he had said within a short time thereafter, even though he was advised of his rights in the meantime. (*People* v. *Clark*, 62 Cal.2d 870, 881-882 [44 Cal.Rptr. 784, 402 P.2d 856]; *People* v. *Reid*, 233 Cal.App.2d 163, 179 [43 Cal.Rptr. 379]; *Leyra* v. *Denno*, 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed. 948].) The later statement was dependent upon the earlier one and both were essentially part of the same verbal transaction.

 The district attorney, in arguing that the evidence should be received and overcoming the apparent reluctance of the trial judge who advised him that he perhaps was laying the ground work for reversal, stated that he would "take that chance." He has taken it, and the judgment must be reversed on this ground as well as on the following point: two witnesses, hospital nurses, Ohma Johnson and Helen Hodge, testified that they heard Mrs. Parriera volunteer that she had shot herself, thus, supporting the theory of the defendant as to how the wound occurred, and substantiating the testimony of another witness that she had stated sometime before the shooting that she would commit suicide if she should lose her husband to the other woman. The trial court permitted this testimony, but severely restricted its effect by admonishing the jury that such evidence could only be considered in testing the credibility of Emilia Parriera as a witness, and that it could have no effect as substantive evidence of the truth of the issue as to whether the complaining witness actually shot herself.

 Respondent correctly observes that Mrs. Parriera was not technically a party to the criminal action (Pen. Code, §§ 683, 684, 685), as the People in their sovereign capacity are the sole collective party plaintiff in the action. (*People* v.

*McLaughlin,* 44 Cal. 435, 437.) And respondent stoutly maintains that a testimonial account of the statements made by Mrs. Parriera in the presence of the two witnesses was purely hearsay. On the other hand, the appellant contends that, in the circumstances, the evidence as to what the complaining witness said constituted an exception to the hearsay rule either as an "admission of the real party in interest" or as a "declaration against interest."

It must be conceded that in the earlier cases the rule denominating Mrs. Parriera's admissions as inadmissible hearsay would have been blindly enforced. In 19 California Jurisprudence, Second Edition, Evidence, section 411, page 154, they are summarized as follows: "In criminal prosecutions, the declaration or confession of a person other than the accused that he himself committed the crime is inadmissible in favor of the accused as hearsay, whether the declarant be dead or alive, unless such declaration comes within the res gestae exception to the hearsay rule."

However, this general rule has yielded in specific instances to what appears to be common sense consideration of what may be a valid defense in a criminal case. It is a matter of common observation that in instances where there are few eyewitnesses and divergent evidence concerning the commission of a crime, an admission by one of the persons involved that certain things occurred, or were absent, may go to the essence of the question of guilt. For example, if a man is accused of murder, and his defense is that a second person, acting independently, used the pistol in the killing, a statement of this second man to a third party that he in fact did do the shooting, which runs counter to his present evidence, may be decisive, and such evidence should go to the jury for what it is worth.

In Witkin, California Evidence, The Hearsay Rule, section 273, at page 310, the text states: "A suicide declaration of the alleged victim in a homicide case is also admissible on behalf of the defendant to support his denial of unlawful killing, since it suggests the probability of the alleged victim's self destruction." The text cites *People* v. *Tugwell,* 28 Cal. App. 348, 359 [152 P. 740].

Appellant also relies upon *People* v. *Wilson,* 14 Cal.App. 515, 518 [112 P. 579], and his opening brief quotes the following: "Where the deceased, with his own hands, administered the poison that caused his death, and the theory of the defense is that the deceased committed suicide, any evidence which tends

to support such theory, or that tends to show that it may be true, is admissible. In such case the deceased, as well as the defendant, is, in a certain sense upon trial, and evidence of any acts, conduct or declarations of deceased tending to prove that he may have committed suicide is relevant and material.''

█ Appellant's argument that the statements made by Mrs. Parriera in the presence of the two nurses should be recognized as exceptions to the hearsay rule as declarations against penal interest is based on the contention that, while Mrs. Parriera, if she attempted to commit suicide, was not guilty of any offense under present California law, yet suicide was a crime at common law (*Tate* v. *Canonica*, 180 Cal.App.2d 898 [5 Cal.Rptr. 28]), and an attempted suicide might today lead to proceedings testing her sanity followed by possible confinement in an institution for the mentally ill. We cannot literally endorse this argument, because a legal inquiry as to whether a person is mentally ill is not a criminal prosecution, but a civil proceeding; technically the statement would not be a declaration against penal interest.

█ We do, however, hold that it was unjust to limit the jury's consideration of a statement of this kind by the person who is said by the defendant to be the actual actor in the shooting for which he is on trial. The recent case of *People* v. *Spriggs*, 60 Cal.2d 868 [36 Cal.Rptr. 841, 389 P.2d 377], points the way. During the trial of that case, one of the arresting officers was questioned on cross-examination whether he had asked the woman companion of the defendant if the narcotics found were hers. Receiving an affirmative answer, the defense counsel next asked him what the woman said in reply. The trial court refused to allow the officer to answer. The judgment of conviction was reversed for this reason. The Supreme Court in an opinion written by Chief Justice Traynor held that the answer should have been allowed on the ground that the question called for a declaration against penal interest, and that such declarations are just as trustworthy as are declarations against pecuniary or proprietary interests. At pages 874-875 of the opinion, the court stated: ''When hearsay evidence is admitted it is usually because it has a high degree of trustworthiness. [Citations.] Thus, declarations against pecuniary or proprietary interest are admitted because they are unlikely to be false. [Citations.] A declaration against penal interest is no less trustworthy . . . . We have concluded, therefore, that the ruling of the trial court was erroneous insofar as it excludes hearsay declarations against penal interest.''

Appellant cogently argues that declarations which might lead to a sanity hearing and confinement in a mental institution, or which, in any event, would subject her to odium and the destruction of what would, in such circumstances, be well-laid plans for revenge, are no less trustworthy.

In the *Spriggs* case the court said (p. 876) that the evidence should be admitted irrespective of whether the person making it was available as a witness.

". . . defense counsel should be allowed to ask Officer Cochran the question objected to, whether or not the unavailability of Mrs. Roland is established."

In *People* v. *Lettrich,* 413 Ill. 172 [108 N.E.2d 488], where the defendant requested a writ of review after a conviction of first degree murder, the court held that when the conviction was based solely upon the accused's repudiated confession, and where the trial court improperly limited cross-examination of a witness, and refused to admit the declaration of a third party that such third party committed the crime, there was justification for a new trial, saying at pages 491-492 [108 N.E.2d] : "The defendant further contends that the court erred in its refusal to admit into evidence the testimony of the director of the behavior clinic of Cook County to show that another person had confessed this same murder to him. The general rule, supported by the great weight of authority, is that extrajudicial declarations of a third party, not made under oath, that he committed the crime, are purely hearsay, and even though they are declarations against interest, are inadmissible. . . . The rule is sound and should not be departed from except in cases where it is obvious that justice demands a departure. But it would be absurd, and shocking to all sense of justice, to indiscriminately apply such a rule to prevent one accused of a crime from showing that another person was the real culprit merely because that other person was deceased, insane or outside the jurisdiction of the court."

In the circumstances, the superior court erred in limiting the effect of the testimony of the witnesses Hodge and Johnson to impeachment purposes only; the error was prejudicial as it necessarily played a substantial part in the conviction of the defendant. This improper restriction and the other serious error heretofore pointed out fully justify a reversal. (*People* v. *Roberts,* 63 Cal.2d 84, 93 [45 Cal.Rptr. 155, 403 P.2d 411].)

We are not impressed by the contention that the evidence concerning the accounts given to an examiner by all

four nurses as to statements made by Mrs. Parriera was improperly admitted. The witness alleged that he had talked with Mrs. Johnson and Mrs. Hodge, as well as other nurses, relative to the matter; the effect with respect to their testimony was to be determined by the jury.

Neither do we find error in the giving of an instruction allegedly offered by the defendant himself. According to the statement of appellant's counsel in his brief, the trial judge had previously said that he would not give the instruction. ■ We cannot go outside of the record to ascertain alleged facts that are not stipulated to. Furthermore, the defendant was apparently not restricted in arguing the effect of the mental condition of Mrs. Parriera.

The fifth alleged error of law was that the plaintiff was permitted to make repeated and irrelevant references to sleeping pills, which the defendant had given to his wife and which she, perhaps in mentally disturbed moments, apparently believed were poisonous. There was not a single item of sane evidence indicating that any pills given to his wife by the defendant were other than perfectly normal medication. But, in this connection, there were no timely objections to the questions eliciting this evidence; and it is also true that the initial questions concerning the pills were asked by defendant's counsel in his cross-examination of Mrs. Parriera.

Neither are we persuaded that the defendant was unduly restricted in examining the jurors on *voir dire*.

The last contention made by the appellant has two aspects; it is claimed: (1) that the district attorney improperly argued the case to the jury and in the course of his address committed numerous instances of prejudicial misconduct, and (2) that the district attorney unfairly treated two of the witnesses by asking them improper questions on cross-examination.

This court would necessarily sustain the appellant's contention that the district attorney committed prejudicial misconduct in some of the instances cited, except that there is not a single instance of any objection made by counsel for the appellant during the argument of the district attorney. ■ Normally, we cannot reverse a judgment for claimed errors on the part of the district attorney in the absence of proper objections in the court below. (*People* v. *Robillard*, 55 Cal.2d 88, 102-103 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Turville*, 51 Cal.2d 620, 636 [335 P.2d 678].)

Nevertheless, as the case must be retried, it is proper for us to observe that, in considering the overall argument of the

district attorney in the present case, it seems that there was an aura of unfairness frequently obvious even in the cold record that should be obviated upon retrial through alert objections by defense counsel. (See *Garden Grove School Dist.* v. *Hendler*, 63 Cal.2d 141, 143 [45 Cal.Rptr. 313, 403 P.2d 721].)

It is a common-place observation that evidence of an existing love affair between a married defendant and a second woman often creates a tendency on the part of a jury to try him for actions *contra bonos mores* rather than for the crime alleged in the information; in such circumstances, the district attorney should be careful to refrain from repeated accusations of improper conduct on the part of the defendant other than the crime for which he is being tried. In the present case, there was multiform repetition by the district attorney of the charge that this defendant was deeply involved in a love affair, contrary to the behavior expected of a married man with a family.

Again, at the time the district attorney examined Mrs. van Zwaluwenburg and after she had refused to answer a question by pleading the Fifth Amendment of the Constitution of the United States, the district attorney stated in open court that he would not prosecute her for any offense, saying: ". . . after reviewing all of the evidence in the case and Mrs. van Zwaluwenburg's statement, I'm satisfied in my mind there was no conspiracy from the evidence to commit murder between Mrs. van Zwaluwenburg and the Defendant, nor did Mrs. van Zwaluwenburg herself fire the bullet. And in view of that, Your Honor, we would ask that immunity be granted to Mrs. van Zwaluwenburg under Section 1324 of the Penal Code."

Notwithstanding this earlier statement of the district attorney, much of his argument to the jury carried a different inference—that of a plot to murder.

This method of conducting the argument exceeded the bounds of good taste and even propriety. Upon retrial, the defense should be more insistent on keeping the issues within a legitimate sphere.

The unfairness of the argument was perhaps stressed by the fact that the court permitted the jury to consider five verdicts instead of two. If the defendant was guilty of attempted murder by shooting his wife, the form of verdict submitted by the court finding that he was guilty of attempted murder in the first degree, while armed with a deadly weapon, was the

only proper guilty verdict. But, in addition, the court told the jury that they could find the defendant guilty of murder in the first degree without finding that the defendant was armed with a deadly weapon, that they could find murder in the second degree, and murder in the second degree with a deadly weapon. The defendant argues that the use of additional verdict forms omitting a finding of the use of a deadly weapon, could have been utilized by the jury if it had believed that the furnishing of the sleeping pills was an attempt to kill by poison. This contention of the appellant seems far-fetched to us, but the unfairness of intimating that the defendant for a long time improperly furnished sleeping pills, possibly poisoned, to the complaining witness was patent.

The defendant also claims that the district attorney was guilty of prejudicial misconduct in asking witness Echols whether he had been investigated by the Oakdale police in connection with an accusation of the theft of $1,000. The state says in reply that the question was asked in good faith in support of an attempt by the district attorney to show prejudice on the part of the witness Echols against the Oakdale police department.

The defendant also complains that in the cross-examination of Dr. Gladen, the psychiatrist, he was asked, relative to electroshock treatments, whether he had ever lost a patient during the process. In view of his detailed description of the administration of such treatments and his mention of the danger involved, the cross-examination was not improper.

The defendant did not receive a fair trial for the two principal reasons heretofore discussed.

The judgment is reversed.

Brown (R. M.), J., and Stone, J., concurred.

A petition for a rehearing was denied October 21, 1965, and respondent's petition for a hearing by the Supreme Court was denied November 24, 1965. Mosk, J., was of the opinion that the petition should be granted.